**COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP**
Jeffrey W. Herrmann
Audra DePaolo
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Telephone: (201) 845-9600

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SERGEY BURMIN and KENNETH W. LUKE, Individually and on Behalf of All Other Persons Similarly Situated, | **Civil Action No.:** |
| Plaintiffs, v. | **CLASS ACTION COMPLAINT** |
| E*TRADE SECURITIES LLC and MORGAN STANLEY SMITH BARNEY LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Sergey Burmin and Kenneth W. Luke ("Plaintiffs") bring this class action for breach of contract individually on behalf of themselves and on behalf of a Class of persons or entities who maintained E*TRADE Securities LLC ("E*TRADE") or Morgan Stanley Smith Barney LLC ("MSSB" and "E*TRADE from Morgan Stanley") retirement accounts at any time beginning February 1, 2018.

Plaintiffs' allegations are based on information and belief, except where the allegations specifically identify documents on which the allegations are based or Plaintiffs' personal knowledge of facts. Plaintiffs' information and belief is based on the investigation of their counsel, including the review of materials on E*TRADE's website (us.etrade.com) and Morgan Stanley's

website (www.morganstanley.com), historical materials available on the internet; materials on competitors' websites; media reports; interest rate data compiled by Crane Data; Securities and Exchange Commission ("SEC") releases, rules, and regulations; Financial Industry Regulatory Authority ("FINRA") rules and regulations; and New York Stock Exchange ("NYSE") rules and regulations.

## PRELIMINARY STATEMENT

1.      Plaintiffs Sergey Burmin and Kenneth W. Luke allege in this breach of contract action that defendants E*TRADE and MSSB failed to pay a reasonable interest rate on cash maintained in retirement accounts, as required by agreements between E*TRADE and MSSB, on the one hand, and retirement account investors, on the other hand.

2.      From the commencement of the class period in February 1, 2018 until October 2, 2020, E*TRADE operated as a subsidiary of E*TRADE Financial Corporation. During the class period, until October 2023 or thereabouts, E*TRADE required that each holder of a retirement account agree to the terms contained in the Retirement Sweep Deposit Account ("RSDA") Program Customer Agreement.

3.      The RSDA Agreement obligated E*TRADE to pay a "reasonable rate of interest" on cash swept from retirement accounts. The RSDA Agreement stated at Section 17: "I authorize such RSDA Program deposits and understand that each Program Bank will pay a reasonable rate of interest, as contemplated by ERISA Section 408(b)(4) and the regulations under Code Section 4975(d)(4)."[1]

---

[1] "RSDA Program Customer Agreement" at "Section 17. Regarding Qualified Plans and Individual Retirement Accounts," available at https://web.archive.org/web/20210128183929/https://us.etrade.com/e/t/prospectestation/pricing?id=1209047000 (last viewed January 30, 2024).

4.      On October 2, 2020, Morgan Stanley (the Parent Corporation of MSSB) completed the acquisition of 100% of E*TRADE Financial Corporation common stock in a stock-for-stock transaction.

5.      Subsequently, in January 2022, the RSDA Agreement was revised to reflect the updated affiliation of the two firms post-merger.

6.      On or about September 1, 2023, E*TRADE began the process of transferring accounts, assets and obligations to MSSB.  As such, MSSB became the broker-dealer of record and assumed custody of accounts, including retirement accounts, at E*TRADE.  Subsequently, the company began operating under the trade name "E*TRADE from Morgan Stanley".[2]  E*TRADE began to transfer all eligible sweep options, including the RSDA, into a MSSB bank sweep program called the BDP.  As of approximately October 2023, the BDP replaced the RSDA as the default sweep available to retirement accounts at E*TRADE.

7.      E*TRADE from Morgan Stanley subsequently required retirement account holders to agree to the terms contained in the Morgan Stanley Bank Deposit Sweep Program ("BDP") Disclosure Statement.  Additionally, retirement account holders were required to consent to one of three E*TRADE from Morgan Stanley individual retirement account ("IRA") disclosure statements associated with their respective accounts: (i) the Individual Retirement Plan and Traditional IRA Disclosure Statement; (ii) the Roth IRA Plan Document & Disclosure Statement; or (iii) the SIMPLE IRA Plan Document & Disclosure Statement (collectively referred to as the "2023 IRA Disclosures").

---

[2] References to "E*TRADE from Morgan Stanley" in this Complaint refer to the MSSB product. E*TRADE's transition to "E*TRADE from Morgan Stanley," signified the assumption of responsibility by MSSB for the custody and clearing services previously provided by E*TRADE.

8.     The 2023 IRA Disclosures each state that the Participant authorizes the deposit or investment of cash balances in the respective account in "deposit accounts with Morgan Stanley Bank, N.A. and/or any other banking affiliate of the Custodian that bear a reasonable rate of interest."

9.     E*TRADE breached the terms of the RSDA Agreement and neglected to provide investors with a reasonable rate of interest on cash in retirement accounts.

10.     E*TRADE from Morgan Stanley breached, and continues to breach, the terms the 2023 IRA Disclosures, failing to pay investors a reasonable rate of interest on cash in retirement accounts.

11.     Rather, as market interest rates rose in 2018 and into 2019, E*TRADE paid investors with up to $4,999 of deposit balances only 0.05% APY (annual percentage yield) interest on their cash.  Investors with $5,000 to $49,999 in deposit balances were paid a high of only 0.07% APY, investors with $50,000 to $99,999 in deposit balances were paid a high of only 0.10% APY, investors with $100,000 to 499,999 in deposit balances were paid a high of only 0.20% APY, and IRA investors with greater than $500,000 in deposit balances were paid a high of only 0.45% APY, as of March 29, 2019.

12.     Similarly, as market interest rates began to rise in 2022 and into 2023, E*TRADE and E*TRADE from Morgan Stanley alike, paid investors with up to $499,999 of deposit balances only 0.01% APY (annual percentage yield) interest on their cash.  ***This is approximately 500 times lower than the contemporaneous federal funds rate and is equivalent to $1 of interest on $10,000 in cash per year***.  IRA investors with greater deposit balances fared only modestly better.  Investors with $500,000 to $999,999 in deposit balances were paid a high of only 0.05% APY, and IRA

investors with greater than $1 million in AUM were paid a high of only 0.15% APY, as of July 29, 2022, through to the date of filing this Complaint.

13.     From 2018 through March 2019, and again from March 2022 onwards, when the Federal Reserve began raising the target federal funds rate, the reasonable value of swept cash consistently exceeded the amounts paid by E*TRADE and E*TRADE from Morgan Stanley on sweep accounts.  Comparable brokerages such as Fidelity Investments, R.W. Baird, Robinhood, and Vanguard Investments, which did not sweep cash to affiliated banks, but rather swept cash to independent, unaffiliated banks, paid substantially higher rates on swept cash, than E*TRADE and E*TRADE from Morgan Stanley.  For example, Fidelity paid retirement investors as much as 2.72% APY on swept cash regardless of AUM, starting in August 2023, and R.W. Baird paid retirement investors between 2.07% to 4.15% on swept cash, depending on cash balances, as of September 8, 2023.

14.     In comparison, E*TRADE and E*TRADE from Morgan Stanley consistently paid among the lowest rates on swept cash among brokerages irrespective of whether these brokerages swept cash to affiliated or unaffiliated banks.

15.     Other metrics, including (i) the federal funds ("FF") rate, and rates paid by (ii) online banks, and on (iii) Morgan Stanley Premium Savings accounts, and (iv) government money market funds, further evidence that the paltry rates paid by E*TRADE and E*TRADE from Morgan Stanley on retirement sweep accounts were not reasonable.

16.     Plaintiffs assert claims for breach of contract for failure to pay a reasonable rate of interest on behalf of a national Class, under New York State law, based on a choice of law provision in the E*TRADE Customer Agreement and the E*TRADE from Morgan Stanley Client Agreement for Self-Directed Accounts, which each class member was required to consent to.

17.     Plaintiffs seek both monetary recovery commencing on February 1, 2018 and declaratory and injunctive relief.  E*TRADE from Morgan Stanley is committing an ongoing wrong.  Accordingly, the class period for which plaintiffs seek relief is ongoing and includes continuing and future retirement account investors.

## PARTIES

18.     Plaintiff, Sergey Burmin, resides in Brooklyn, New York.

19.     Plaintiff, Kenneth W. Luke, resides in Evergreen, Colorado.

20.     Defendant E*TRADE is a Delaware corporation with its principal executive offices located in Jersey City, New Jersey.  E*TRADE is a registered broker-dealer, member of the Securities Investor Protection Corporation ("SIPC"), and a wholly owned subsidiary of E*TRADE Capital Management, LLC ("ETCM"), which is an indirect subsidiary of Morgan Stanley.

21.     Defendant MSSB is a Delaware corporation with its principal executive offices located in New York, New York.  MSSB is a registered broker-dealer, member of the Securities Investor Protection Corporation ("SIPC"), and a wholly owned subsidiary of Morgan Stanley.  In 2023, MSSB assumed the responsibility of the custody and clearing services previously provided by E*TRADE, and the investment advisory services provided by ETCM.

22.     As of January 17, 2024, E*TRADE from Morgan Stanley continues to advertise on its website that it maintains headquarters in Jersey City, NJ.

23.     MSSB, operates through E*TRADE by Morgan Stanley, the BDP, among other things, which automatically deposits, or "sweeps" cash into interest-bearing FDIC-insured deposit accounts established by, and in the name of, MSSB as agent and custodian, at one or more sweep banks: Morgan Stanley Bank, N.A. ("MSBNA") and Morgan Stanley Private Bank, N.A.

("MSPBNA").[3]  The sweep program, as it applies to retirement accounts, is governed by one of the three 2023 IRA Disclosures.  Previously, E*TRADE offered an equivalent to the BDP sweep program, the RSDA, which was governed by the RSDA Agreement.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(d)(2).  Plaintiffs are diverse from E*TRADE and plaintiff Luke is diverse from MSSB and the amount in controversy exceeds $5 million.

25.     Venue is properly laid in this District under 28 U.S.C. §1391(b), as certain of the acts and conduct complained of herein occurred in this District.

## SUBSTANTIVE ALLEGATIONS

### A.  Overview of Sweep Programs

26.      A "sweep program" is a "service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product as described in § 270.2a-7 or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation."  *See* 17 CFR 240.15c3-3(a)(17).

27.     Sweep deposits play a pivotal role as a capital source for banks, empowering them to utilize these deposits for various corporate purposes.  This includes activities such as making loans or investing in government securities.  The disparity between the interest rate paid and the interest rate earned by a bank on those deposits is commonly referred to as the net interest margin ("NIM").

---

[3] https://us.etrade.com/l/f/agreement-library/summary-of-bdp (last viewed January 30, 2024)

**B. Plaintiff's IRA Investments**

28.    Plaintiff, Sergey Burmin, in August 2018, opened a Roth IRA at E*TRADE.

29.    Plaintiff Burmin, to his best recollection, opened his account electronically, by scrolling through electronic screens and acknowledging consent to the various agreements provided online by E*TRADE.

30.    To the best of his recollection, and based on the investigation of his counsel, Burmin was required to acknowledge the terms of the RSDA Agreement.  The RSDA served as the default sweep vehicle for retirement accounts since at least 2018.

31.    Plaintiff, Kenneth W. Luke, in January 2010, opened a Rollover IRA at E*TRADE. This account underwent conversion from a previously held 401K through Fidelity, which had been opened through a former employer.

32.    Plaintiff Luke does not recall the specific details of the account opening process. However, through the ongoing maintenance of his E*TRADE IRA, he was obligated to acknowledge and be bound by the terms stated in the RSDA Agreement.

33.    As per the contractual terms outlined in the RSDA Agreement, E*TRADE was bound to offer retirement account investors a reasonable rate of interest on the cash swept through the program: "I authorize such RSDA Program deposits and understand that each Program Bank will pay a reasonable rate of interest, as contemplated by ERISA Section 408(b)(4) and the regulations under Code Section 4975(d)(4)."[4]

34.    The RSDA Agreement acknowledged that the sweep program was financially beneficial to E*TRADE: "I understand and agree that [E*TRADE] and Reich & Tang each receive

---

[4] E*TRADE Financial RSDA Program Customer Agreement at Section 17.  Regarding Qualified Plans and Individual Retirement Accounts.
https://web.archive.org/web/20210128183929/https://us.etrade.com/e/t/prospectestation/pricing?id=1209047000 (last viewed January 30, 2024)

monthly compensation for services provided to the Program Banks based on RSDA Program deposit account balances with the Program Banks. [E*TRADE] is also paid a brokerage and servicing fee by the Program Banks."[5]  Notably, during this period, E*TRADE's Program Banks were listed as affiliated institutions E*TRADE Bank and E*TRADE Savings Bank.[6]

35.    On February 20, 2020, Morgan Stanley and E*TRADE Financial Corporation announced that they had entered into a definitive agreement under which Morgan Stanley would acquire E*TRADE Financial Corporation in an all-stock transaction valued at approximately $13 billion.  On October 2, 2020, Morgan Stanley announced that it had completed its planned acquisition.

36.    On January 1, 2022, E*TRADE Savings Bank merged with and into E*TRADE Bank, and subsequently E*TRADE Bank merged with and into MSPBNA, with MSPBNA as the surviving bank.

37.    On January 1, 2022, E*TRADE published an updated RSDA Agreement to reflect that the affiliated Program Banks were now MSBNA and MSPBNA.   The updated agreement continued to maintain that E*TRADE was contractually obligated to offer retirement account investors a reasonable rate of interest: "I authorize such RSDA Program deposits and understand that each Program Bank will pay a reasonable rate of interest, as contemplated by ERISA Section 408(b)(4) and the regulations under Code Section 4975(d)(4)."[7]

---

[5] E*TRADE had appointed Reich & Tang Deposit Solutions LLC ("Reich & Tang") to provide certain administrative, recordkeeping, and other services with respect to the operation of RSDA.
[6] E*TRADE Financial RSDA Program Customer Agreement at Section 9.  Fees.
https://web.archive.org/web/20210128183929/https://us.etrade.com/e/t/prospectestation/pricing?id=120090 47000 (last viewed January 30, 2024)
[7] RSDA Program Customer Agreement, Effective January 2022 at Section 17.  Regarding Qualified Plans and Individual Retirement Accounts.
https://web.archive.org/web/20220809064349/https://us.etrade.com/e/t/prospectestation/pricing?id=120090 47000 (last viewed January 30, 2024)

38.    The updated RSDA Agreement, acknowledged that the sweep program was financially beneficial to Morgan Stanley:

> The RSDA Program yields other financial benefits for [E*TRADE] and one or more of its affiliates. The Program Banks may use the cash balances in RSDA Program deposit accounts to fund certain lending and investment activity. As with other banks, the profitability of the Program Banks is determined in large part by the difference, or "spread," between (1) the interest paid and other fees and costs incurred by it on the RSDA Program deposit accounts; and (2) the interest or other income earned on its loans, investments, and other assets. RSDA Program deposit accounts at Morgan Stanley Bank, N.A. and Morgan Stanley Private Bank, National Association provide a stable source of investable and lendable funds for the Program Banks, which may be at a lower cost than other funding sources.[8]

39.    On or about September 1, 2023, E*TRADE began the process of transferring accounts, assets and obligations to MSSB.  This marked MSSB's transition as the broker-dealer of record, assuming custody of accounts, including retirement accounts, at E*TRADE.  The "Important Update About Your E*TRADE Account" document dated June 2023, stated that, from this point, "[n]ew Morgan Stanley retirement account documents will govern, not those of E*TRADE".[9] Additionally, the document informed retirement investors, "[i]f your current Sweep Option is the Retirement Sweep Deposit Account Program ("RSDA"), your balances will be transferred to BDP on or about September 1, 2023."[10] E*TRADE, administered by MSSB, adopted the operating name "E*TRADE from Morgan Stanley".

40.    E*TRADE from Morgan Stanley subsequently requires retirement account holders to agree to the terms contained in the Morgan Stanley BDP Disclosure Statement, in addition to

---

[8] *Id.* at Section 9.  Fees.
[9] "Important Update About Your E*TRADE Account" at p. 26.
https://content.etrade.com/etrade/estation/pdf/noticeofchanges3.pdf?em=6509 (last viewed January 30, 2024)
[10] *Id.* at p. 22.

one of three IRA Disclosures based on the specific account type.  Holders of a Traditional IRA, Simplified Employee Pension Account ("SEP IRA"), Salary Reduction Simplified Employee Pension Account ("SAR-SEP IRA"), Rollover IRA, Spousal IRA, Inherited IRA and/or Rollover IRA Combined Account are required to consent to the E*TRADE from Morgan Stanley Individual Retirement Plan and Traditional IRA Disclosure Statement, dated January 2023, which states that "[t]he Participant authorizes the deposit or investment of cash balances in the "Account" in: (a) deposit accounts with Morgan Stanley Bank, N.A. and/or any other banking affiliate of the Custodian that bear a reasonable rate of interest".[11]  Holders of a Roth IRA are required to consent to the Roth IRA Disclosure and holders of a SIMPLE IRA are required to consent to the SIMPLE IRA Disclosure. All three of the 2023 IRA Disclosures contain an identical reasonable rate provision.[12]

41.    The Summary of the BDP acknowledges that E*TRADE from Morgan Stanley has a conflict of interest in sweeping cash to an affiliated entity:

> Morgan Stanley, the Sweep Banks and their affiliates may receive other financial benefits in connection with the BDP. The Sweep Banks may use the cash balances in their Deposit Accounts to fund certain lending activity. As with other depository institutions, the profitability of the Sweep Banks is determined in large part by the difference between the interest paid and other costs incurred by them on the Deposit Accounts, and the interest or other income earned on their loans, investments and other assets. Deposits in Deposit Accounts provide the Sweep Banks with a stable, cost-effective source of lendable funds.[13]

---

[11] Morgan Stanley Individual Retirement Plan and Traditional IRA Disclosure Statement at Section 3.3 Cash Balances.  https://us.etrade.com/l/f/agreement-library/ira-plan-documents (last viewed January 30, 2024).

[12] *See* Roth IRA Disclosure Section 3.3 Cash Balances. https://us.etrade.com/l/f/agreement-library/roth-ira-plan-documents (last viewed January 30, 2024). *See also* SIMPLE IRA Disclosure Section 3.3 Cash Balances. https://us.etrade.com/l/f/agreement-library/simple-ira-plan-documents (last viewed January 30, 2024).

[13] https://us.etrade.com/l/f/agreement-library/summary-of-bdp (last viewed January 30, 2024).

42.    The E*TRADE from Morgan Stanley Client Agreement for Self-Directed Accounts, dated January 3, 2023, acknowledges that Morgan Stanley sets the rate of interest offered in the sweep program: "Interest paid in the BDP or Cash Balance Program is calculated using the interest rates, calculation methodology, and compounding frequency set by Morgan Stanley, which are subject to change by us from time to time without prior notice."[14]  The Client Agreement adds that "[e]xcept for the statute of limitations applicable to claims, this Self-Directed Account Agreement is governed by the laws of the State of New York."

43.    The SEC, in its Staff Bulletin:  Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest, issued August 3, 2022, emphasized that "cash sweep programs" are a "common source[ ] of conflicts of interest."[15]

44.    Section 4975 of the Internal Revenue Code (entitled "Tax on Prohibited Transactions"), referenced in the RSDA Agreements, IRA Disclosures and the Client Agreement for Self-Directed Accounts apply to IRAs generally.  *See* 26 U.S.C. §4975(e)(1)(B) (defining "plan" to include "an individual retirement account described in [IRC] Section 408(a)").

45.    IRC §4975(c)(1)(B) defines as a "prohibited transaction" the "lending of money or other extension of credit between a plan [*i.e.*, an individual IRA] and a disqualified person."

46.    The definition of a "disqualified person," under Section 4975(e)(2) includes, among others, "a person providing services to the plan."  MSBNA, MSPBNA, E*TRADE Bank and E*TRADE Savings Bank, are "disqualified person[s]" under Section 4975(e)(2).  Thus, the sweep agreement for retirement accounts between Plaintiffs and E*TRADE referenced in the RSDA Agreement, and between Plaintiffs and E*TRADE from Morgan Stanley referenced in the BDP

---

[14] https://us.etrade.com/l/f/agreement-library/client-agreement (last viewed January 30, 2024).
[15] https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest (last viewed January 30, 2024).

Disclosure and 2023 IRA Disclosures are "prohibited transaction[s]" under §4975(c)(1)(B). E*TRADE acknowledged as much in its reference to IRC §4975(d)(4) in the RSDA Agreement.

47.     IRC §4975(d)(4) provides several "exemptions," or safe harbors, for otherwise "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution."

48.     Section 4975 recognizes that, even in markets for financial services generally characterized by vigorous competition, related party transactions into which customers are defaulted can offer rates at risk of being depressed by an inherent conflict of interest. Accordingly, conflicted transactions such as affiliated entity cash sweeps are required to pay a reasonable rate of interest. In particular, retirement account customers are vulnerable to receiving inadequate compensation for the use of uninvested cash in their accounts. IRC Section 4975 thus seeks to ensure related party transactions involving retirement accounts are priced at fair market rates.

49.     Similarly, ERISA Section 408(b)(1) exempts from prohibition various interested party transactions that "bear a reasonable rate of interest," among other requirements. *See* 29 U.S.C. §1108(b)(1).

50.     To protect investors because of the conflict of interest and in light of the Internal Revenue Code and ERISA provisions addressing that conflict of interest with respect to retirement accounts, the 2023 IRA Disclosures obligate E*TRADE from Morgan Stanley to pay retirement account investors a reasonable rate of interest on cash swept to the affiliated banks. Similarly, under the RSDA Agreement, E*TRADE was obligated to provide retirement account investors with a reasonable rate of interest on cash swept to affiliated banks to ensure investor protection.

51.     E*TRADE from Morgan Stanley fails to differentiate in the interest rate paid based on the reasonable rate provision and pays the same rates of interest on retirement accounts as it pays on non-retirement sweep accounts.[16]

52.     Similarly, E*TRADE neglected to differentiate interest rates based on the reasonable rate provision, offering the same rates on both retirement and non-retirement sweep accounts.  While providing an alternative to the RSDA for non-retirement accounts through the Extended Sweep Deposit Account ("ESDA") Program, E*TRADE failed to fulfill its statutory obligation to pay a reasonable rate of interest on retirement account cash, maintaining identical interest rates for both the RSDA and ESDA.

53.     Regulations promulgated by the Department of the Treasury confirm that the cash swept to MSBNA, MSPBNA, E*TRADE Bank and E*TRADE Savings Bank is a "prohibited transaction" but would be permissible (*i.e.*, be within the exemption or safe harbor) if it paid "a reasonable rate of interest." Thus, Treasury regulations state that "Section 4975(d)(4) exempts from the excise taxes imposed by section 4975 investment of all or a part of a plan's assets in deposits bearing a reasonable rate of interest in a bank or similar financial institution…, even though such bank or similar financial institution is a fiduciary or other disqualified person with respect to the plan." 26 C.F.R. §54.4975-6(b)(1).

54.     Treasury regulations also mandate that when a financial institution "invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization "must name" the institution and "must state that [it] … may make

---

[16] *See* "Morgan Stanley Bank Deposit Program Disclosure Statement" at p. 2. https://www.morganstanley.com/wealth-disclosures/pdfs/BDP_disclosure.pdf (last viewed January 30, 2024).

investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)." *Id.* §54.4975-6(b)(3).

55.     A March 15, 2017 letter to the Department of Labor from the American Bankers Association, states that with respect to the investment of IRA assets into "one or more bank deposit products, ... banks have routinely relied on the statutory exemption [for prohibited transactions] available for bank deposit product programs under Section 4975(d)(4) of the Code...."[17] In support of this contention, the ABA attached a white paper from Morgan, Lewis & Bockius LLP, which (at 4) specifically notes that a bank may "invest an IRA's assets in its own deposit accounts" "which bear a reasonable interest rate" pursuant to the exemption "found in Section 4975(d)(4) of the Code and Section 408(b)(4) of ERISA."  Defendants recognize that their sweep programs constitute conflicted, presumptively prohibited transactions that are only permitted if depositors are receiving a "reasonable" rate of interest.

56.     Section 4975 and ERISA Section 408 place the burden of demonstrating reasonableness on the financial institution.  The principle underlying the reasonable rate provisions—that conflicted transactions, while prohibited, can be made lawful if the "disqualified person" can sustain their burden of proof that the terms were "reasonable"—is consistent with the well-settled common law principle (in the corporate context, trust context, or otherwise) that a defendant can escape liability arising from its conflict of interest if it can show the challenged action is "entirely fair" to the beneficiary.  Consistent with the common law, the reasonable rate provisions impose on E*TRADE and E*TRADE from Morgan Stanley the burden of demonstrating that the prohibited transaction is nonetheless reasonable.

---

[17] www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/rules-and-regulations/public-comments/1210-AB79/00937.pdf (last viewed January 30, 2024).

57.     Other brokerages acknowledge that they are required to pay reasonable rates only on retirement accounts, and that that obligation derives from ERISA Section 408(b)(4) and Internal Revenue Code Section 4975(d)(4).  For example, the J.P. Morgan Securities LLC ("J.P. Morgan") Traditional IRA Custodial Agreement states (at p. 6) similarly with respect to sweep accounts, that J.P. Morgan will pay a reasonable rate pursuant to IRC §4975 –

> [T]he Custodian may invest any uninvested cash held in the IRA in bank savings instruments or bank deposits bearing a reasonable rate of interest in JPMCB's banks so long as (to the extent necessary) such investment is in compliance with section 4975(d)(4) of the Code, Treasury regulations section 54.4975-6(b)(1), the class exemption of PTCE 81-8, dated January 23, 1981 or other applicable law.[18]

58.     While the wording in the E*TRADE, E*TRADE from Morgan Stanley and J.P. Morgan agreements may differ, they all reflect a government-mandated contractual requirement to pay a reasonable rate to retirement account holders.

59.     Rates paid on swept cash at E*TRADE and E*TRADE from Morgan Stanley are based on tiers as determined by "the value of total deposit balances in the account.

60.     According to the E*TRADE website, E*TRADE from Morgan Stanley currently (as of January 30, 2024) offers eight interest rate tiers.  The lowest six account tiers: $0-$4,999, $5,000-$24,999, $25,000-$49,999, $50,000-$99,999, $100,000-$249,000 and $250,000-$499,999, yield 0.01% interest on swept cash as of January 30, 2024.  Deposit balances of $500,000-$999,999 yield 0.05% interest on swept cash as of January 30, 2024.  Deposit balances of $1,000,000 and above yield 0.15% interest on swept cash as of January 30, 2024.[19]

---

[18] https://www.chase.com/content/dam/chase-ux/documents/personal/investments/jpm-investment-account-agreements.pdf (last viewed January 30, 2024).
[19] https://us.etrade.com/l/options-uninvested-cash/sweep-rates (last viewed January 30, 2024).

### C. **E\*TRADE Failed to Pay a Reasonable Rate of Interest on Plaintiffs' Swept Cash**

61.     In August 2018, the federal funds target rate was 1.75% - 2.00% and fluctuated only slightly thereafter, reaching a high of 2.25% - 2.50% on May 1, 2019.  Throughout this period E\*TRADE offered their lowest tier of investors between 0.01% and 0.05% interest on swept retirement cash.  E\*TRADE offered their highest tier of investors between 0.01% interest and 0.45% interest on swept retirement cash.

62.     From May 2019 onwards, rates continued to fluctuate, falling slowly to 1.00% - 1.25% on March 30, 2020, before market interest rates fell to essentially zero.

63.     During a period when interest rates were generally on the rise in tandem with increases to the Federal Funds rate, E\*TRADE and E\*TRADE from Morgan Stanley maintained disproportionately low interest rates on swept cash in retirement accounts.  Beginning in March 2022, the federal funds target rate began to gradually rise from 0.00 – 0.25% to 0.25 - 0.50% on March 17, 2022 and ending 2022 at 4.25 - 4.50%.  As of January 12, 2024, the federal funds target rate was 5.25% - 5.50% and the effective federal funds rate as published by the Federal Reserve Bank of New York rate was 5.33%.

64.     By contrast, the RSDA rates concluded 2022 at 0.01% for account balances up to $499,999, 0.05% for balances between $500,000 and $999,999, and 0.15% for balances of $1,000,000 and above.

65.     Despite the prevailing market trends, interest rates at E\*TRADE by Morgan Stanley have remained stagnant. As of January 5, 2024, the interest rates on retirement cash, although now under the BDP and administered by MSSB, have seen no increase, remaining at 0.01% for account balances up to $499,999, 0.05% for balances between $500,000 and $999,999, and 0.15% for balances of $1,000,000 and above.

66.     The rate of return offered by E*TRADE and E*TRADE by Morgan Stanley on swept cash has significantly impacted Plaintiff Burmin's investment strategy. Faced with an unreasonably low rate of return in the sweep program, Plaintiff Burmin has found it necessary to modify his approach to investing dividends received. Rather than allowing funds to remain in the Sweep Program, yielding nominal interest of 0.01%, Plaintiff Burmin has been compelled to promptly reinvest the funds. Conversely, had a reasonable rate of interest been offered on swept cash, it would be Plaintiff Burmin's preference to patiently await the opportune moment for reinvestment.

67.     The term "reasonable" is not defined explicitly in the RSDA or in the 2023 IRA Agreements. Based on its ordinary meaning (using Webster's and Oxford dictionary definitions), "reasonable" is synonymous with "fair." Accordingly, "reasonable" in the valuation context is synonymous with "fair market value" and can be determined using a market approach of comparable instruments.

68.     A reasonable rate of interest is the rate that would result in a competitive market under fair market valuation conditions, *i.e.* a rate parties would agree to in an arm's length transaction where neither party was able to exert market power over the other.

69.     Fair market value is defined by the IRS as: "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 25.2512-1.

70.     The Organization for Economic Co-operation and Development ["OECD"] guidance for financial transactions states that "it is necessary to consider the conditions that independent parties would have agreed to in comparable circumstances. Independent enterprises, when considering whether to enter into a particular financial transaction, will consider all other

options realistically available to them, and will only enter into the transaction if they see no alternative that offers a clearly more attractive opportunity to meet their commercial objectives."[20]

71.     IRS regulations define an "arm's-length interest rate" for purposes of assessing transfer pricing between related entities as

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances. All relevant factors shall be considered, including the principal amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans between unrelated parties. [26 CFR §1.482-2(a)(2)].

72.     Consistent with the common-sense, plain meaning of reasonableness, which means fair, a reasonable rate pursuant to IRC §4975 as mandated under E*TRADE's RSDA and E*TRADE from Morgan Stanley's 2023 IRA agreements, is one that takes into account other market rates for similar albeit not identical products in arm's-length transactions.

73.     The Department of Labor in 2003 had been requested to grant an exemption from the restrictions regarding "prohibited transactions" in ERISA § 408(a) and IRC § 4975(c)(2), with regard to deposits held at Deutsche Bank, A.G.

74.     The Department of Labor, which maintains enforcement authority with respect to the prohibited transaction rules in the IRC, provided in granting the exemption, a definition of "reasonable rate" that took into account a broad range of similar products to bank deposit accounts:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as

---

[20] OECD Transfer Pricing Guidance on Financial Transactions: Inclusive Framework on BEPS: Actions 4, 8-10, 10.18 – 10.19. Available at https://perma.cc/TNY9-9GK2 (last viewed January 30, 2024)

sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.[21]

75.    Three-month treasury bills, an instrument the Department of Labor has advised should be considered in determining a reasonable interest rate (*supra* at ¶63), rose in yield from 0.046% as of January 1, 2022 to 5.394% as of January 9, 2024.

76.    E*TRADE was financially motivated to default its customers into its low-paying cash alternatives and RSDA rates were set unilaterally by E*TRADE Bank and E*TRADE Savings Bank until 2022 to maximize net income to those banks.

77.    E*TRADE from Morgan Stanley continues to exhibit these financial motivations. E*TRADE from Morgan Stanley maintains in its retirement brokerage accounts hundreds of millions if not billions of dollars in cash. BDP rates are set unilaterally by MSBNA and MSPBNA to maximize net income, and by taking advantage of retail investors, who--either due to lack of sophistication or lack of time in constantly moving cash made available from dividend payments and the like into higher-yielding money market investments—are what industry insiders refer to as a "rate insensitive" population.  Unlike large institutions, retail retirement account investors are usually the constituency least likely to punish brokerages for underpaying them on excess cash.

78.    Because of the stickiness of retail deposit accounts such as IRA accounts, swept deposits are a valuable deposit franchise for brokerage businesses.

79.    Sweep deposits are the aggregation of individual cash balances across a large number of accounts held by relatively rate insensitive customers, and together provide a stable source of funding for E*TRADE from Morgan Stanley, and previously, for E*TRADE.

---

[21] Prohibited Transaction Exemption 2003-11, §III(f), 68 Fed. Reg. 34,648 (June 10, 2003), available at https://perma.cc/Z7YJ-QDHM (last viewed January 30, 2024).

80.     Morgan Stanley benefits in the hundreds of millions of dollars (if not more) from the NIM spread between the rate E*TRADE from Morgan Stanley pays its retirement customers and the rate at which MSBNA and MSPBNA can lend to borrowers or otherwise invest cash deposits.

81.     Previously, E*TRADE Financial Corporation benefited from the NIM spread between the rate E*TRADE paid its retirement customers and the rate at which E*TRADE Bank and E*TRADE Savings Bank could lend to borrowers or otherwise invest cash deposits.

82.     That sweep accounts are bundled with brokerage accounts make sweep customers even less sensitive to interest rates paid on cash than depositors in separate banks.  Customers with brokerage and affiliated sweep accounts hold only a fraction of their combined assets in cash so their choice of broker and affiliated sweep account will depend on the features and terms primarily of their brokerage accounts, and not the interest rate on their excess cash.  Investors are more focused on the performance of their equity and bond investments, and tend not to consider the performance of cash in their portfolio.

### 1. Brokers That Sweep Retirement Cash to Unaffiliated Banks Pay (Presumptively) Reasonable Rates

83.     The question of whether E*TRADE from Morgan Stanley, and previously E*TRADE, offer a reasonable rate on swept retirement account cash, is more appropriately assessed by comparison to rates on deposit accounts that are not affiliated with sweep programs, because the rates on affiliated sweep programs are not market-based, but rather are rates investors are defaulted into, and are subject to inherent conflicts of interest.

84.     It is the related party relationship between brokerage services and cash sweep products that leads to regulatory concern that deposit rates offered to customers in sweep accounts might not be reasonable, fair market rates.

85.    E*TRADE from Morgan Stanley and E*TRADE have a conflict of interest in connection with offering cash sweep options to customers because they have both benefitted from paying below market rates on deposits being held by their affiliated banks.

86.    This conflict of interest is widespread across the retail brokerage industry and gives rise to the prohibitions of affiliated brokerage sweep deposits under the IRC and ERISA. For this reason, the sweep rates paid by other affiliated banks and brokerage firms alone are not a valid benchmark for assessing the reasonableness of the rates paid.

87.    E*TRADE from Morgan Stanley and its predecessor, E*TRADE, implemented profit-maximizing pricing strategies. The sweep rates, unilaterally set by MSBNA and MSPBNA for E*TRADE from Morgan Stanley, and by E*TRADE Bank and E*TRADE Savings Bank for E*TRADE, were inconsistent with the fair market value standard and were not presumptively reasonable rates.

88.    The profitability of this practice is overwhelmingly apparent for E*TRADE from Morgan Stanley's affiliate banks, MSPBNA and MSBNA. Morgan Stanley's acquisition of E*TRADE was motivated by this practice, and allowed Morgan Stanley to generate interest income by sweeping billions of dollars from E*TRADE as "nearly free money for Morgan Stanley to generate interest income."[22]  Carleton English, in her April 2023 Barron's commentary, highlighted its impact, "[t]hat wasn't worth much when rates were low, but it's paying off as rates have edged up; the firm reported $9.3 billion of net interest income last year, nearly double its 2019 total of $4.7 billion."[23]

---

[22] See Barron's April 8, 2023 article "Inside Morgan Stanley's Success—and What's Ahead" https://www.barrons.com/articles/morgan-stanley-ceo-james-gorman-stock-price-e618fe58 (last viewed January 30, 2024)
[23] Id.

89.     Other brokerages that swept cash to unaffiliated banks set rates between brokerages and banks resulting from something that more closely resembles arm's-length negotiations. For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and have consistently paid substantially higher rates of interest than E*TRADE, E*TRADE from Morgan Stanley and other brokerages that sweep cash to affiliated banks.

90.     At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million). E*TRADE, on the other hand, paid 0.01% interest (on cash balances up to $499,999) and 0.15% interest (on cash balances above $5 million).

91.     The federal funds target rate continued to increase in 2023 hitting an effective yield of 5.33% on July 27 2023. Similarly, Fidelity and R.W. Baird continued to increase the rates it paid on swept cash, which continues to the present. As of January 12, 2024, Fidelity paid 2.69% interest on cash balances regardless of tier, and R.W. Baird paid between 2.03% interest (on cash balances up to $1 million) and 4.11% interest (on cash balances above $5 million). In comparison, E*TRADE from Morgan Stanley continued to pay 0.01% (on cash balances up to $499,999) and 0.15% (on cash balances above $5 million).

92.     On August 7, 2019, Fidelity issued a press releases announcing that "it has challenged conventional industry practices by automatically directing investors' cash into higher yielding options available for brokerage and retirement accounts as well as providing product choice – all without any minimum requirements."[24]

---

[24] https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/press-release/fidelity-breaks-status-quo-080719.pdf (last viewed January 30, 2024).

93.    Fidelity emphasized that Plaintiffs' circumstances are representative of customers who choose to do business with broker-dealers such as E*TRADE and E*TRADE from Morgan Stanley, who refuse to be transparent as to the amount of interest they pay customers.  The Fidelity press release stated, "Recent customer research shows that many investors don't focus on the rate paid on their cash when they open an account and, too often, they don't take action later.  Fidelity has made it easy for customers by automatically giving them the higher yielding option at account opening, while also providing other investment options for those customers who prefer it."

94.    The press release added that Fidelity's approach in offering high yields on cash balances "is contrary to typical industry practices of defaulting customers' cash into a low-yielding product – often at an affiliated bank – with no other option in what the industry calls a 'cash sweep.'"

95.    However, E*TRADE, E*TRADE from Morgan Stanley and other such brokerages that swept cash to affiliated banks, who had a conflict of interest and profited from paying low rates, continue to pay low rates of interest on FDIC-insured sweep accounts.

96.    The rates set by Fidelity and R.W. Baird at arm's-length are evidence of the fair market or reasonable rates based on business and economic conditions.  The rates set by E*TRADE and E*TRADE by Morgan Stanley, by default, in self-interested transactions, are not reasonable rates.

### 2.  E*TRADE Failed to Pay Reasonable Rates Even Compared to Other Sweep Accounts

97.    Even when measured against other brokerages, E*TRADE consistently found itself at the bottom when compared to its peers in terms of interest rates on sweep accounts.

98.    For instance, according to a Jason Zweig article in the Wall Street Journal from March 9, 2018, E*TRADE was reported as the lowest-paying among major brokerages.  Despite

24

one-month Treasury bills yielding 1.6% that week, "the rates major brokers are paying on so-called sweep accounts, the main reservoir where they hold clients' cash [...] ranged from as low as 0.01% at eTrade [...] up to -- if "up" is the right word -- 0.25% at UBS and 0.27% at Fidelity Investments"[25].

99.     Crane Data, a data source commonly used in the banking industry, reported on its blogs that E*TRADE [from Morgan Stanley] consistently paid the lowest interest rate of "major brokerages."  In its blog dated January 9, 2024[26], for example, Crane Data reported that:

> Our Brokerage Sweep Intelligence Index, an average of FDIC-insured cash options from major brokerages, was unchanged at 0.61%. The latest Brokerage Sweep Intelligence, with data as of Jan. 5, shows that there were no changes over the past week. Three of the 11 major brokerages tracked by our BSI still offer rates of 0.01% for balances of $100K (and lower tiers). These include: E*Trade, Merrill Lynch and Morgan Stanley. [27]

100.     Certain brokerages that sweep cash to unaffiliated banks, Interactive Brokers, Robinhood, WeBull, and Vanguard for example, offer substantially higher rates than E*TRADE from Morgan Stanley: Interactive Brokers pays up to 4.83% on swept cash, Robinhood pays 1.5% as of August 11, 2022 or 4.9% for Robinhood Gold members as of July 27, 2023," WeBull pays 5% and Vanguard pays 3.7%.

---

[25] *See* The Wall Street Journal March 9, 2018 article "Brokers to Investors: Your Cash Ain't Nothin' But Trash" https://www.wsj.com/articles/brokers-to-investors-your-cash-aint-nothin-but-trash-1520613969 (last viewed January 30, 2024)

[26] January 9, 2024 blog, "Money Fund Yields Inch Lower to 5.18%" at https://cranedata.com/archives/daily-links/2024/1 (last viewed January 30, 2024).

[27] Because different brokers use a different base to determine tiers it is not always practicable to make a pure apples-to-apples comparison across all tiers.  For example, E*TRADE and Morgan Stanley use "household balances" while Merrill uses "statement-linked" balances and other firms use cash balances.

101.    Fidelity Investment's FDIC-insured sweep rate and R.W. Baird's sweep rates have been at all times since March 2022 substantially higher than the rates paid by E*TRADE and E*TRADE by Morgan Stanley.

**3.    Morgan Stanley's Premium Savings Account Pays a Presumptively Reasonable Rate**

102.    MSSB offers competitive rates to investors on other deposit products.  For example, MSSB offers a Premium Savings Account from MSPBNA for non-retirement investors.   As of January 9, 2024, the APY of the Premium Savings Account is 4.25% for balances of $500,000 or more, 4.25% for balances of $100,000-$499,999, 4.25% for balances of $50,000-$99,999, 4.25% for balances of $5,000-$49,999, and 4.25% for balances of less than $5,000.  No minimum initial deposit is required to open an account.[28]

103.    According to the Premium Savings Bank Deposit Program Terms and Conditions, cash is swept out of the Premium Savings Account, and deposited in money market deposit accounts ("MMDAs") and demand deposit accounts ("DDAs") with other FDIC-insured banks.[29]

104.    Like the BDP and RSDA, according to the Premium Savings Account Program Bank List, the Premium Savings Account sweeps exclusively to affiliated banks MSBNA and MSPBNA.[30]

105.    When faced with motivated investors, E*TRADE from Morgan Stanley paid equivalent, market rates.  The rates that MSSB was willing to pay on Premium Savings Accounts is evidence of a reasonable rate of interest.

---

[28] https://us.etrade.com/bank/premium-savings-account (last viewed January 30, 2024).
[29] https://us.etrade.com/e/t/estation/contexthelp?id=1902000100 (last viewed January 30, 2024).
[30] https://us.etrade.com/e/t/estation/contexthelp?id=1902001000 (last viewed January 30, 2024).

106.    The gross disparity between rates on the Premium Savings Account and the BDP and RSDA demonstrates that the rate paid by E*TRADE from Morgan Stanley and E*TRADE on swept retirement cash is unreasonable.

### 4.    Rates Paid By MMF Sweep Accounts Are Presumptively Reasonable Rates

107.    The rates paid by E*TRADE and E*TRADE from Morgan Stanley on retirement accounts are also unreasonable compared to rates paid on government money market funds.

108.    SEC Rule 2a-7 "is the principal rule governing money market funds."[31] According to Rule 2a-7(a)(14), government MMFs are required to invest at least 99.5% of their total assets in cash, U.S. Treasury securities, or fully collateralized repurchase agreements (repos).  Moreover, MMFs are required to invest in short-term investments, which are defined as securities with maturities no greater than 397 days.  The SEC rule rules further require the dollar-weighted average maturity of the securities owned by a MMF to not exceed 60 days.[32]

109.    Treasuries are backed by the full faith and credit of the U.S. government.  Accordingly, Treasuries are risk-free investments that carry essentially no credit risk.  Moreover, portfolios with average maturities of 90-days or less are short-term and so subject to a negligible amount of interest rate risk.  Because government MMFs invest solely in short-term government securities or cash, government money market funds are essentially risk-free and have never lost

---

[31] *See* https://www.sec.gov/files/rules/proposed/2021/ic-34441-fact-sheet.pdf (last viewed January 30, 2024).
[32] *See* 17 CFR § 270.2a-7(c)(2).

money.[33]  For these reasons, government MMFs have the same or better risk profile as FDIC-insured accounts with assets under the insurable limits set by the FDIC.[34]

110.    A money market mutual fund is "income producing, low risk, and liquid," and an appropriate capital preservation alternative for use in retirement accounts.  *See* 29 CFR § 2550.404c-1(b)(2)(ii)(C)(2)(ii).

111.    Academic literature supports the equivalence of MMFs and FDIC-insured accounts.  For example, Federal Reserve economists Afonso *et al.* (2023) state that MMFs and bank deposits are "close substitutes from an investor's perspective."[35]

112.    Brokerages that sweep cash to money market mutual funds pay substantially higher rates of interest than E*TRADE, E*TRADE from Morgan Stanley and other brokerages that sweep cash to affiliated banks.  For example, in 2022-23 Fidelity Investments swept cash into its Fidelity Government Money Market Fund (SPAXX) and Vanguard Investments swept investors cash into its Vanguard Federal Money Market Fund (VMFXX)  Both government money markets consist of at least 99.5% U.S. government or agency securities backed by the full faith and credit of the

---

[33]  Only three money market funds have ever lost money – or broken the buck – the First Multifund for Daily Income fund in 1978, the Community Bankers US Government Fund in 1994, and the Reserve Primary Fund in 2008.  However, none of these funds were Government MMFs.  All three of these funds invested heavily in non-government securities including commercial paper, or instruments with longer durations than what are allowed in a government money market fund.  *See e.g.,* Wiggins, Rosalind Z., and Andrew Metrick. "The Federal Reserve's Financial Crisis Response D: Commercial Paper Market Facilities." *The Journal of Financial Crises 2*, no. 2 (2020): 116-143.

[34]  As further evidence, see the article by SEC staff, "Money Market Funds in the Treasury Market" (Baklanova, Kuznits, and Tatum, September 1, 2022) showing that "assets in government MMFs more than doubled in 2016 following implementation of the 2014 MMF reforms and increased considerably once again in the first half of 2020, when demand for government assets surged amidst the COVID-19 pandemic (Table 1)."  This suggests that government MMFs, like bank deposits, have generally low default risk.  Accessible at https://www.sec.gov/files/mmfs-treasury-market-090122.pdf (last viewed January 30, 2024).

[35] Afonso, Cipriani, and La Spada. "Banks' Balance-Sheet Costs, Monetary Policy, and the ON RRP." *FRB of New York Staff Report* 1041 (2022).

U.S. government.  Both Fidelity and Vanguard government money market funds have minimal risk that is equivalent to FDIC-insured accounts.  *See* 17 C.F.R. 270.2a-7(a)(11) discussed *infra*.

113.    In fact, because banks are free to invest in long-term securities that can substantially decline in value during periods of rising interest rates, bank deposit accounts are substantially riskier than government MMFs, which are required to invest in short-term assets.  *See* Letter dated June 2, 2023 from Federated Hermes to the SEC at pp. 1 and 4.[36]

114.    A money market deposit account ("MMDA") is a high-yield savings account that allows depository financial institutions to be competitive with money market mutual funds.

115.    There is no reason in fact why interest rates paid on MMDAs should not be considered competitive with interest rates paid on MMFs since banks are allowed (but not required to) invest in the same instruments as government MMFs.

116.    Rather, banks have more options to invest FDIC–insured sweep funds than issuers of government MMFs, which are required to invest in short-term government securities.

117.    E*TRADE from Morgan Stanley acknowledges on its that FDIC-insured deposit accounts and MMFs can be used interchangeably as sweep options.[37] E*TRADE from Morgan Stanley offers investors two money market funds as part of the BDP (these are affiliated with Morgan Stanley): MGPXX and DWGXX.  Retirement account deposit balances of above $20 million are swept, without limit, to MGPXX.  Retirement investors with less than $20 million in deposit balances, are not permitted to purchase MMFs.

118.    The NYSE Information Memorandum ("IM") 05-11 addressing "Customer Account Sweeps to Banks," states under an all caps bolded heading "CONFLICTS OF

---

[36] https://www.sec.gov/comments/s7-22-21/s72221-198539-397002.pdf (last viewed January 30, 2024).
[37] https://us.etrade.com/l/options-uninvested-cash/sweep-rates (last viewed January 30, 2024).

INTEREST" that a money market fund is a superior alternative for a sweep account to an FDIC-

Insured deposit account:

> A change from a money market mutual fund to a bank sweep fund may be inconsistent with the customer's reasonable expectations with regard to money market rates. While a registered investment company, such as a money market mutual fund, is bound by fiduciary obligations to its shareholders (customers of the member organization) to seek the highest rates prudently available (less disclosed fees and expenses), when customer funds are swept to an affiliated bank it is in the interest of the member organization and its affiliates to pay as low a rate as possible, consistent with their views of competitive necessities. There may be no necessary linkage with rates prevailing in the market, and these funds are not being managed, in this instance, under the same fiduciary obligations.

119.    The SEC's Investor Bulletin: Bank Sweep Programs, dated June 5, 2014, explicitly

refers to money market mutual funds as acceptable sweep options:

> One option, a bank sweep program, typically involves the automatic transfer (or "sweep") of cash in the brokerage account into a deposit account at a bank that may or may not be affiliated with the broker-dealer. Other options include leaving cash in the brokerage account, or sweeping cash to one or more money market mutual funds.[38]

120.    As noted above, SEC regulations define a sweep program as consisting of either a

MMF or an FDIC-insured savings account.  *See* 17 CFR 240.15c3-3(a)(17).

121.    A 2016 bulletin from the OCC urged banks to use government MMFs as sweep

options:

> Banks that offer sweep arrangements between deposit accounts and MMFs should assess the respective processing characteristics, system requirements, compliance requirements, and liquidity characteristics of government, retail, and prime MMFs. Based on operational and liquidity considerations, most banks will likely conclude that once the SEC's MMF reforms are fully implemented, government funds are the only practical option for bank deposit to MMF sweep arrangements.[39]

---

[38] https://www.sec.gov/oiea/investor-alerts-bulletins/ib_banksweep (last viewed January 30, 2024).
[39] Office of the Comptroller of the Currency, "OCC Bulletin 2016-17: Money Market Funds: Compliance with SEC Money Market Fund Rules by Bank Fiduciaries, Deposit Sweep Arrangements, and Bank

122.    Many of E*TRADE and E*TRADE from Morgan Stanley's competitors, including Fidelity Investments and Vanguard investments, use MMFs as their primary sweep option.[40] For example, the Fidelity Government Money Market Mutual Fund (SPAXX), which Fidelity employs as a primary sweep account, has a fundamental investment objective to "seek[ ] as high a level of current income as is consistent with preservation of capital and liquidity."[41]  The Fidelity MMF is managed by an investment advisor, and is supervised by a Board of Trustees, each with an obligation to ensure that the fund is operated in a manner intended to achieve its fundamental investment objective.

123.    The substantially higher yields offered by MMFs as sweep options is strong evidence that the rates paid by E*TRADE and MSSB on swept retirement cash are not reasonable.

## CLASS ACTION ALLEGATIONS

124.    Plaintiffs brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of persons or entities who maintained E*TRADE or E*TRADE from Morgan Stanley retirement accounts at any time beginning February 1, 2018 (the "Class").

125.    Plaintiffs allege an ongoing breach of contract.  Accordingly, the class period is ongoing.

---

Investments," May 19, 2016, accessed at https://www.occ.gov/news-issuances/bulletins/2016/bulletin-2016-17.html (last viewed January 30, 2024).
[40] "Fidelity Highlights Benefits of Default Cash Options for Retail Accounts," by David Armstrong, Wealth Management, August 7, 2019, accessed at https://www.wealthmanagement.com/investment/fidelity-highlights-benefits-default-cash-options-retail-accounts (last viewed January 30, 2024); "Fidelity is Giving Customers Higher Rates on Cash. Here's Why.," by Daren Fonda, Barron's, August 9, 2019, p. 3, accessed at https://www.barrons.com/articles/fidelity-sweep-accounts-cash-rates-federal-reserve-schwab-merrill-lynch-vanguard-etrade-51565291732 (last viewed January 30, 2024).
[41] The SPAXX Prospectus is available at https://perma.cc/QA98-QP96 (last viewed January 30, 2024).

126.    Excluded from the Class are E*TRADE, MSSB, MSBNA, and MSPBNA, officers or directors of E*TRADE, MSSB, MSBNA, and MSPBNA, and any of their heirs, successors, assigns, or spouses.

127.    Each of the elements of Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) are established.

a.    The members of the Class are so numerous that joinder of all members is impracticable.

b.    While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, E*TRADE and MSSB maintained billions of dollars of cash balances nationwide. Plaintiffs conclude that there are thousands of members of the Class.  Record owners and other members of the Class may be identified from records maintained by E*TRADE and MSSB and may be notified of the pendency of this action by email or publication.

c.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by E*TRADE's and MSSB's wrongful conduct complained of herein.

d.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class litigation.

e.    E*TRADE and MSSB have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

f.    Common issues of law or fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the common issues of law or fact that will predominate are:

i.    The appropriate methodology to establish the reasonable rate of interest.

ii.    Whether E*TRADE or MSSB or Plaintiffs have the burden of proving the reasonableness of E*TRADE's rates of interest.

iii.    Whether E*TRADE or MSSB fails to pay depositors a reasonable rate of interest on cash balances maintained in retirement brokerage accounts.

**CAUSE OF ACTION ON BEHALF OF ALL RETIREMENT
ACCOUNT CLASS MEMBERS FOR BREACH OF CONTRACT**

128.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

129.    E*TRADE and MSSB are contractually obligated to provide Plaintiffs and Class Members with "a reasonable rate of interest" on retirement cash assets.

130.    Plaintiffs and Class members have performed their contractual obligations.

131.    E*TRADE and MSSB, in breach of their contractual obligations, failed to pay Plaintiffs and Class Members a "reasonable rate" on cash assets.

132.    Plaintiffs and other Class Members have been and continue to be injured from E*TRADE and MSSB's breach of the contract requiring it to pay a "reasonable rate" on cash.

WHEREFORE, Plaintiffs demand judgment on behalf of herself and other members of the Class as follows:

1.    Damages reflecting, at a minimum, the difference between the reasonable market rate to be determined by the trier of fact and the interest actually earned on cash accounts.

33

2.      Injunctive relief barring E*TRADE and MSSB from continuing to pay an unreasonable rate of interest on retirement sweep accounts.

3.      Interest as a matter of law.

4.      Fees and expenses reasonably incurred in this Action, including attorney and expert fees.

5.      Such other and further relief as is just.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated: February 1, 2024

**COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP**

By: _s/Jeffrey W. Herrmann_
Jeffrey W. Herrmann
Audra DePaolo
Park 80 Plaza West-One
Saddle Brook, New Jersey 07663
(201) 845-9600
(201) 845-9423 (facsimile)
jwh@njlawfirm.com
ad@njlawfirm.com

_Liaison Counsel for Plaintiffs and the
Putative Classes_

**WOLF POPPER LLP**
Robert C. Finkel
Adam J. Blander
Philip M. Black
Antoinette Adesanya
Emer Burke
845 Third Avenue
New York, NY 10022
Tel: 212-759-4600

_Lead Counsel for Plaintiffs and the Putative
Classes_