Kevin H. Marino
John D. Tortorella
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, NJ 07928
Phone:  973-824-9300
Facsimile:  973-824-8425
kmarino@khmarino.com
jtortorella@khmarino.com

*Attorneys for Defendants*

Pamela A. Miller (admitted *pro hac vice*)
Lauren M. Wagner (admitted *pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Phone: 212-326-2000
Facsimile: 212-326-2061
pmiller@omm.com
lwagner@omm.com

Meaghan VerGow (admitted *pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Phone: 202-383-5300
Facsimile: 202-383-5414
mvergow@omm.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SERGEY BURMIN and KENNETH W. LUKE, Individually and on Behalf of All Other Persons Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> E\*TRADE SECURITIES LLC and MORGAN STANLEY SMITH BARNEY LLC, <br><br> Defendants. | No. 24-cv-00603 (ES) (MAH) <br><br> Hon. Esther Salas, U.S.D.J. <br><br> **ORAL ARGUMENT REQUESTED** <br><br> Motion Date:  May 20, 2024 |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................... 1

BACKGROUND .............................................................................................. 5

    A.    Plaintiffs' Enrollment in E*TRADE's Sweep Program ..................... 5

    B.    Plaintiffs' Enrollment in the E*TRADE from Morgan Stanley Sweep Program ........................................................................... 7

    C.    Plaintiffs' Allegations .................................................................. 10

ARGUMENT ................................................................................................. 10

    I.    Plaintiffs' Breach Theory Is Contradicted by the Agreements' Plain Language ........................................................................... 12

    II.    The Complaint Fails to Plead That the Sweep Programs' Rates Were Unreasonable ...................................................................... 16

        A.    Defendants' Rates Meet Plaintiffs' Definition of Reasonableness. .................................................................. 17

        B.    Plaintiffs' Comparison to Rates Provided by Distinct Products and Financial Institutions Is Inappropriate. ....................... 20

    III.    Plaintiffs Do Not Plead That They Were Injured by E*TRADE's and MSSB's Alleged Breaches. ................................................... 27

CONCLUSION ............................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AmBase Corp. v. 111 W. 57th Sponsor LLC,*
   148 N.Y.S.3d 61 (N.Y. App. Div. 2021).................................................................. 31

*Amron v. Morgan Stanley Inv. Advisors Inc.,*
   464 F.3d 338 (2d Cir. 2006) ................................................................................. 28

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009).............................................................................................11

*Bat Blue Corp. v. Situs Holdings, LLC,*
   2016 WL 3030814 (D.N.J. May 26, 2016) ............................................................ 15

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007).............................................................................................11

*Brock v. Walton,*
   794 F.2d 586 (11th Cir. 1986) .............................................................................. 30

*Buck v. Hampton Twp. Sch. Dist.,*
   452 F.3d 256 (3d Cir. 2006) .................................................................................. 5

*Click Corp. of Am. v. Redco Foods, Inc.,*
   424 F. Supp. 2d 753 (D.N.J. 2006).......................................................................11

*Collins v. Mary Kay, Inc.,*
   874 F.3d 176 (3d Cir. 2017) .................................................................................11

*Davis v. Washington Univ. St. Louis,*
   960 F.3d 478 (8th Cir. 2020) ................................................................................ 26

*DeBlasio v. Merrill Lynch & Co.,*
   2009 WL 2242605 (S.D.N.Y. July 27, 2009)............................................ 14, 16, 33

*Divane v. Nw. Univ.,*
   953 F.3d 980 (7th Cir. 2020) ................................................................................ 28

*Dupree v. Prudential Insurance Co. of America,*
   2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) ..................................................... 20, 26

*Fin Assocs., LP v. Hudson Specialty Ins. Co.,*
   2016 WL 4414782 (D.N.J. Aug. 18, 2016), *aff'd*, 741 F. App'x 85 (3d Cir. 2018) ................11

*Gawrych v. Astoria Fed. Savings & Loan,*
   48 N.Y.S.3d 450 (N.Y. App. Div. 2017)................................................................. 32

*Hassler v. Sovereign Bank,*
   374 F. App'x 341 (3d Cir. 2010) .......................................................................... 16

*Hecker v. Deere & Co.,*
   556 F.3d 575 (7th Cir. 2009), *abrogated on other grounds by Hughes v. Nw. Univ.*, 63 F.4th
   615 (7th Cir. 2023).......................................................................................... 21, 28

*In re Honda Am. Mfg., Inc. Erisa Fees Litig.*,
    661 F. Supp. 2d 861 (S.D. Ohio 2009) ................................................................. 21

*Horn v. McQueen*,
    353 F. Supp. 2d 785 (W.D. Ky. 2004) .................................................................. 20

*HV Assoc., LLC v. PNC Bank, N.A.*,
    2019 WL 13410676 (D.N.J. May 20, 2019) ......................................................... 17

*Leber v. Citigroup, Inc.*,
    2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) ........................................................ 22

*Lukacs v. Purvi Padia Design LLC*,
    2022 WL 2116868 (D.N.J. June 13, 2022) ........................................................... 12

*N.J. Second Amend. Soc'y v. N.J. Press Ass'n.*,
    2021 WL 4822050 (D.N.J. Oct. 15, 2021) ........................................................... 19

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*,
    392 F.3d 520 (2d Cir. 2004) ................................................................................ 31

*Negrete v. Citibank, N.A.*,
    187 F. Supp. 3d 454 (S.D.N.Y. 2016) .................................................................. 13

*Parker Waichman LLP v. Squier, Knapp & Dunn Commc'ns, Inc.*,
    28 N.Y.S.3d 603 (N.Y. App. Div. 2016) .............................................................. 31

*Redmond v. Ace Am. Ins. Co.*,
    614 F. App'x 77 (3d Cir. 2015) ............................................................................ 11

*In re Simpson*,
    61 B.R. 580 (Bankr. W.D.N.Y. 1986) .................................................................. 30

*Tibble v. Edison Int'l*,
    729 F.3d 1110 (9th Cir. 2013) *vacated on other grounds*, 135 S. Ct. 1823 (2015) ................. 26

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    2021 WL 240737 (S.D.N.Y. Jan. 25, 2021) .................................................... 23, 30

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    2023 WL 2918982 (S.D.N.Y. Apr. 12, 2023) ............................................ 24, 27, 30

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    2023 WL 4239073 (S.D.N.Y. June 28, 2023) ............................................ 23, 24, 27

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    464 F. Supp. 3d 634 (S.D.N.Y. 2020) .................................................................. 24

*Valentine v. Midland Funding, LLC*,
    2020 WL 7074352 (D.N.J. Dec. 3, 2020) .............................................................. 5

*Wade Park Land Holdings, LLC v. Kalikow*,
    589 F. Supp. 3d 335 (S.D.N.Y. 2022) .................................................................. 15

*Welch v. TD Ameritrade Holding Corp.*,
    2009 WL 2356131 (S.D.N.Y. July 27, 2009) ....................................................... 32

**Statutes**

26 U.S.C. § 4975(c)(1)(B) ................................................................................. 7

26 U.S.C. § 4975(d)(4) ............................................................................... 7, 15

26 U.S.C. § 4975(e)(2) ..................................................................................... 7

29 U.S.C. § 1002(18)(B) ................................................................................ 18

29 U.S.C. § 1108(b)(8) ................................................................................... 18

29 U.S.C. § 1108 ............................................................................................ 18

**Other Authorities**

Daren Fonda, *Fidelity Is Giving Customers Higher Rates on Cash. Here's Why.*, Barron's (Aug. 9, 2019); https://www.barrons.com/articles/fidelity-sweep-accounts-cash-rates-federal-reserve-schwab-merrill-lynch-vanguard-etrade-51565291732 (last visited Mar. 9, 2024) ................................ 22

David Armstrong, *Fidelity Highlights Benefits of Default Cash Options for Retail Accounts*, Wealth Management (Aug. 7, 2019), https://www.wealthmanagement.com/investment/fidelity-highlights-benefits-default-cash-options-retail-accounts (last visited Mar. 9, 2024) .................................................. 22

NYSE Information Memorandum 05-11 (2005), *available at* https://www.nyse.com/publicdocs/nyse/markets/nyse/rule-interpretations/2005/05-11.pdf .............................................................................................. 22

Press Release, Fidelity Investments, Fidelity Investments Takes Another Strong Step to Provide Investors Unparalleled Value (Aug. 7, 2019), https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/press-release/fidelity-breaks-status-quo-080719.pdf .......................................................................... 24

**Regulations**

26 C.F.R. § 54.4975-6(b) ................................................................................. 7

29 C.F.R. pt. 2550 .......................................................................................... 19

68 Fed. Reg. 34646, 34648 (June 10, 2003) .................................................. 20

81 Fed. Reg. 21002, 21031 (Apr. 8, 2016) .................................................... 19

Defendants E*TRADE Securities LLC ("E*TRADE") and Morgan Stanley Smith Barney LLC ("MSSB") (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the complaint (ECF. No. 1) filed by Kenneth Luke and Sergey Burmin ("Plaintiffs") under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This case is a baseless attempt to obtain inflated interest payments by rewriting the terms of contracts to which Plaintiffs agreed long ago, but now seek to disavow.  Plaintiffs argue that MSSB and E*TRADE did not provide a reasonable rate of interest on uninvested cash swept from their individual retirement accounts ("IRAs") to affiliated banks.  Rather than compare E*TRADE's and MSSB's rates to similar products with materially similar features, however, the Complaint alleges unreasonableness by comparing the returns to financial products with different risks, features, and purposes.

The Complaint fails for the simple reason that E*TRADE's and MSSB's cash sweep programs were *not* obligated as a matter of law or contract to "match" interest rates offered by other, different products.  To the contrary, the agreements Plaintiffs signed expressly informed them that the rates paid on the cash sweep programs may not be as high as rates available through other products, including many of the products Plaintiffs now rely on as a basis for their claim.  It would give Plaintiffs a windfall to retrospectively award them interest payments that were available through alternative financial products that Plaintiffs opted not to use when they had the opportunity to do so.

IRA holders, like any brokerage customer, may have some uninvested cash in their accounts, whether because they are still deciding how to invest it or because they are preparing to take a distribution from the account.  As an alternative to having uninvested cash sit idle, earning no interest, brokerage firms may offer customers the choice of using a "sweep" feature

that automatically sweeps this uninvested cash into an account that provides Federal Deposit

Insurance Corporation ("FDIC") protection and interest payments until the customer decides to

allocate the cash to a different investment.  The sweep feature is not intended as a long-term cash

investment strategy.  Unlike other kinds of holdings, such as a savings account or a money

market mutual fund, this cash is available for immediate investment without restriction or delay.

Quick access to the cash and FDIC protection are key features of the sweep programs that

E*TRADE and MSSB offered to self-directed retirement account customers (the "Sweep

Programs").

      Plaintiffs chose to take advantage of the Sweep Programs rather than leaving their

uninvested cash in their brokerage accounts (or placing the cash in an investment, or with a

different IRA provider).  Customers who chose to participate in the Sweep Programs were

provided with the applicable interest rates on a real-time basis.  Importantly, in the governing

agreements, they acknowledged that the rates provided may be lower than the rates offered

through other investment alternatives and/or providers, and they accepted the responsibility to

compare the rates offered through the Sweep Programs to the rates available through those

alternatives.

      Now, years later, Plaintiffs allege that what they contractually agreed could happen has,

in fact, happened:  Namely, that rates offered through the Sweep Programs have, at times, been

lower than rates on other, cherry-picked financial products that Plaintiffs inaccurately claim are

analogous (such as a savings account and a money market fund).  Plaintiffs attempt to twist these

allegations into a breach of contract claim, contending that in providing lower interest rates than

non-analogous products, Defendants violated a provision of their agreements they believe

entitled them to a higher rate.  Plaintiffs' claim should be dismissed for multiple reasons.

First, Plaintiffs' theory—that the rates paid through the Sweep Programs violated the governing contracts because they were lower than the rates of certain other products—squarely contravenes the disclosures and terms in the agreements Plaintiffs executed.  Plaintiffs agreed at the outset that the Sweep Programs' rates could be lower than other products—including the alternative products and providers that Plaintiffs now cite as purported comparators.  The rates for the Sweep Programs were publicly disclosed, as provided in the agreements, and were included on Plaintiffs' account statements each month.  To the extent Plaintiffs were interested in maximizing returns on their uninvested cash, they contractually accepted the responsibility to compare the disclosed rates to other market alternatives, which could offer different rates but also different features.  Plaintiffs apparently preferred the mix of liquidity, safety, and other features of the Sweep Programs over a higher interest rate.

The agreements' reference to a "reasonable rate of interest" relates specifically to Internal Revenue Code ("IRC") exemptions that apply to tax-advantaged accounts like these.  That provision unsurprisingly makes no mention of *any* of the products Plaintiffs now claim are comparators, and inclusion of these products as a basis for assessing reasonableness would be completely inconsistent with the sections of the agreement expressly stating that rates offered by alternative products could be higher.  Plaintiffs should not be permitted to retrospectively reject the rates they contractually accepted.

Second, Plaintiffs do not adequately plead that the market-tested interest rates they actually received were not "reasonable."  The Sweep Programs' interest rates have continuously passed Plaintiffs' own measure of reasonableness—market testing—because they were accepted through arm's length transactions and on an ongoing basis by accountholders who were free to move their cash to other investments or other IRA providers.

Plaintiffs' approach is also inconsistent with the law.  Courts consistently recognize that, as a matter of law, reasonableness cannot be established by comparing rates across dissimilar products, and yet Plaintiffs rely on comparisons to products that are unequivocally dissimilar from the Sweep Programs.  Plaintiffs also use misleading and incomplete data when comparing the Sweep Programs' rates to other firms' sweep rates, precluding any basis for concluding that the Sweep Programs' rates were outside the range of reasonableness.  None of these comparisons plausibly supports the conclusion that E*TRADE's and MSSB's rates were unreasonable, and the comparisons could not in any event overcome the fact that the rates pass Plaintiffs' own market test.

Last, Plaintiffs fail to plead that any alleged breaches by Defendants have caused harm to Plaintiffs.  Participation in the Sweep Programs provided Plaintiffs with interest and FDIC insurance that they would not have otherwise received if they let their uninvested cash sit idly in their brokerage accounts.  To the extent they were seeking higher returns, Plaintiffs at all times had the ability to move their uninvested cash to other options entailing greater risks and/or different features, such as stocks, certificates of deposit, money market funds or bonds that provided higher yields and lower liquidity.  Plaintiffs chose to maintain their cash in the Sweep Programs, with their concomitant liquidity and risk benefits.  The returns Plaintiffs experienced were the result of that choice, not any breach by Defendants.

For all of these reasons, the Court should dismiss the Complaint with prejudice.

# BACKGROUND[1]

## A.      Plaintiffs' Enrollment in E*TRADE's Sweep Program

In August 2018, Mr. Burmin opened a self-directed Roth IRA at E*TRADE.  (Compl. ¶ 28.)  In January 2010, Mr. Luke opened a Rollover IRA at E*TRADE.  (*Id.* ¶ 31.)  Plaintiffs explicitly allege that when they opened these self-directed IRAs, each agreed to be bound by the Retirement Sweep Deposit Program Customer Agreement (the "RSDA").  (*Id.* ¶ 2.)  Pursuant to the RSDA, Plaintiffs consented to "having the uninvested cash balances in [their IRAs] each day automatically deposited into accounts" at two of E*TRADE's affiliated banks, E*TRADE Bank and E*TRADE Savings Bank (the "E*TRADE Program Banks").  (Ex. A (RSDA) §§ 1–32.)[2] The Sweep Program offered Plaintiffs immediate liquidity and access to their swept cash, providing that, on request, "[E*TRADE] will liquidate [Plaintiffs'] RSDA cash balances, either by transferring the balances to [Plaintiffs'] linked Retirement Account[s] or . . . by remitting the remaining balance to [Plaintiffs]."  (*Id.* § 10.)  The RSDA explained that the E*TRADE Program Banks were depository institutions insured by the FDIC, which would provide insurance coverage up to $250,000 in swept cash at each E*TRADE Program Bank in the event that an

---

[1] The Complaint (ECF No. 1) is referred to as "Compl."  For purposes of this Motion to Dismiss, Defendants assume, without conceding, that the factual allegations in the Complaint are true. Unless otherwise indicated, all emphasis is added to, and internal quotation marks omitted from, quoted passages.

[2] "[I]t is well-established law that, under the Rule 12(b)(6) standard, a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  *Valentine v. Midland Funding, LLC*, 2020 WL 7074352, at *3 (D.N.J. Dec. 3, 2020) (emphasis removed); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim.").  The Complaint cites as the governing agreements those listed as exhibits ("Ex.") to the Declaration of Meaghan VerGow in Support of Defendants' Motion to Dismiss the Complaint.

E*TRADE Program Bank failed.  (*Id.* § 7.)  Plaintiffs could withdraw their consent to participate in the RSDA Sweep Program at any time.  (*Id.* § 11.)

The RSDA contained a discrete section, plainly titled "Interest," specifically addressing the terms on which Plaintiffs would receive interest on their swept balances.  (*Id.* § 8; Compl. ¶¶ 30, 32.)  That section disclosed that the interest rate or "Annual Percentage Yield" applicable to Plaintiffs' swept balances would not only be stated on Plaintiffs' account statements but was also available in real-time "24 hours a day, seven days a week" through the E*TRADE website and E*TRADE's customer service line.  (RSDA § 8.)  Plaintiffs acknowledged that, "[t]he interest rate I earn on my RSDA Program deposits may be higher or lower than the rates available to depositors making non-RSDA Program deposits with [the E*TRADE Program Banks] directly, through other types of accounts at [E*TRADE], with other depository institutions in comparable accounts, with money market mutual funds, or with alternative short-term investment options."  (*Id.*)  Plaintiffs further acknowledged that it was incumbent on them to compare the disclosed interest rates as well as the RSDA's other terms with other available alternatives.  (*Id.* ("I understand that I should compare the terms, rates of return, required minimum amounts, charges, and other features of the RSDA Program with other accounts and investment alternatives.").)[3]  Thus, to the extent that Plaintiffs were interested in maximizing the interest earned on their free cash balances, the RSDA made clear that it was incumbent on them to do so.

---

[3] The fact that interest rates could be lower than rates of other types of investments was also disclosed, and acknowledged by Plaintiffs, in an earlier section of the RSDA titled "Introduction to the RSDA Program."  (RSDA § 2 ("I understand that I may receive a lower rate of return on these funds than on other types of investments, but that those other types of investments may not offer FDIC deposit insurance.").)

Completely separate from the "Interest" section, the RSDA contained a section titled, "Regarding Qualified Plans and Individual Retirement Accounts," which stated, "I authorize such RSDA Program deposits and understand that each Program Bank will pay a reasonable rate of interest, as contemplated by ERISA Section 408(b)(4) and the regulations under [IRC] Section 4975(d)(4)." (*Id.* § 17.)  This disclosure language relates to an exception to ERISA's "prohibited transactions" rules that (among other things) permits broker-dealers to sweep cash to affiliated banks.

Specifically, certain tax exemptions are unavailable for "prohibited transactions," including "lending money or other extension of credit" between an IRA and "a person providing services to the plan," unless a prohibited transaction exemption applies.  *See* 26 U.S.C. §§ 4975(c)(1)(B), (e)(2).  Section 4975(d)(4) provides such an exemption for transactions in which an affiliate invests "all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank."  *Id.* § 4975(d)(4); *see also* 26 CFR § 54.4975-6(b) ("Section 4975(d)(4) exempts from excise taxes by section 4975 investment of all or part of a plan's assets in deposits bearing a reasonable rate of interest.").  This section of the RSDA satisfies the regulation's customer disclosure requirement such that the customer can qualify for tax exempt treatment on sweep transactions.  *See* 26 CFR § 54.4975-6(b) ("[I]n the case of a bank . . . that invests plan assets in deposits in . . . its affiliates under an authorization contained in a plan . . . such authorization must . . . state that such bank . . . may make investments in deposits which bear a reasonable rate of interest.").  The RSDA's authorization makes no reference to the rates of products now cited by Plaintiffs as purported comparators.

**B.      Plaintiffs' Enrollment in the E*TRADE from Morgan Stanley Sweep Program**

On October 2, 2020, MSSB's corporate parent acquired E*TRADE.  (Compl. ¶ 4.)  In January 2022, E*TRADE revised the RSDA to reflect that Morgan Stanley Bank, N.A. and

Morgan Stanley Private Bank, N.A. would replace the E*TRADE Program Banks for E*TRADE's Sweep Program (the "MS Program Banks," and together with the E*TRADE Program Banks, the "Program Banks").  (*See* Ex. B (RSDA Program Customer Agreement Effective January 2022 or "Revised RSDA").)[4]  On or about September 1, 2023, E*TRADE began transferring its accounts, assets, and obligations to MSSB.  (Compl. ¶ 39.)  E*TRADE informed customers that "new Morgan Stanley retirement account documents will govern, not those of E*TRADE," and customers of the RSDA would have their balances transferred to the Bank Deposit Program, or "BDP," a Sweep Program offered through "E*TRADE from Morgan Stanley."  (*Id.*)  As of approximately October 2023, BDP replaced RSDA as the default sweep program available to retirement accounts at E*TRADE.  (*Id.* ¶ 6.)

To enroll in BDP, Plaintiffs agreed to the terms of the Morgan Stanley BDP Disclosure Statement (the "BDP Disclosure"), as well as one of the three different disclosure statements based on specific account type (collectively, the "IRA Disclosures").[5]  (*Id.* ¶ 7.)  The IRA Disclosures specified that the brokerage account components of the IRAs (including the Sweep Program) were governed by the E*TRADE from Morgan Stanley Client Agreement for Self-

---

[4] The Revised RSDA otherwise contained substantially similar terms to the RSDA.

[5] The IRA Disclosures comprise the Morgan Stanley Individual Retirement Plan and E*TRADE from Morgan Stanley Traditional IRA Disclosure Statement (the "Traditional IRA Disclosure"), the Morgan Stanley Roth IRA and E*TRADE from Morgan Stanley Roth IRA Disclosure Statement (the "Roth IRA Disclosure"), and the Morgan Stanley SIMPLE IRA Plan and E*TRADE from Morgan Stanley SIMPLE IRA Disclosure Statement (the "Simple IRA Disclosure").  (Compl. ¶ 7; Ex. C (Traditional IRA Disclosure); Ex. D (Roth IRA Disclosure); Ex. E (Simple IRA Disclosure).)  Plaintiffs do not allege which of the IRA Disclosures they each signed, but they allege that holders of a Rollover IRA (like Mr. Luke) "are required to consent to" the Traditional IRA Disclosure and that holders of a Roth IRA (like Mr. Burmin) "are required to consent" to the Roth IRA Disclosure.  (Compl. ¶ 40.)  Plaintiffs allege that all retirement account holders were required to consent to one of the three disclosures.  (*Id.* ¶¶ 7, 23.)

Directed Accounts (the "SDA Agreement"), to which Plaintiffs also agreed. (IRA Disclosures § XII.)

Through the SDA Agreement and BDP Disclosure, Plaintiffs agreed that cash balances in their IRAs would be "automatically deposited into" deposit accounts at the MS Program Banks (MSSB's affiliates) up to a certain threshold, and thereafter to other Morgan Stanley affiliated banks.[6] (Ex. F (BDP Disclosure) at 4; Ex. G (SDA Agreement) § 7.) The SDA Agreement explained that cash swept from IRAs would be insured by the FDIC. (SDA Agreement § 7.) Customers of the BDP could take advantage of immediate liquidity and cash management features like check writing and debit cards. (*Id.* § 6.) Plaintiffs could "at any time close [their] Self-Directed Account(s) by giving Morgan Stanley notice." (*Id.* § 19.)

Like the RSDA, the SDA Agreement and BDP Disclosure specifically addressed the terms on which Plaintiffs would receive interest on their swept balances. The SDA Agreement contained a section titled "Payment of Interest on Free Credit Balances" which disclosed that the interest rate applicable to Plaintiffs' swept balances would still be found at etrade.com/rates. (*Id.* § 7.A.) The BDP Disclosure similarly contained a section titled "Interest on the Deposit Accounts," in which Plaintiffs again agreed that interest "may be higher or lower than the interest available on other deposit accounts offered by a Sweep Bank or on deposit accounts offered by other depository institutions," and again acknowledged that they "should compare the terms, interest rates, required minimum amounts and other features of the Deposit Accounts with other deposit accounts and alternative investments." (BDP Disclosure at 7.) Plaintiffs agreed that MSSB was "under no legal or regulatory requirement to maximize" interest rates. (*Id.* at

---

[6] Balances in IRA accounts above $20 million were swept into a money market mutual fund. (BDP Disclosure at 2.)

10.)  In fact, the BDP Disclosure expressly contrasted the sweep accounts with "money market funds," which "have a fiduciary duty to seek to maximize their yield to investors, consistent with their disclosed investment and risk-management policies and regulatory constraints."  (*Id.*)

Each of the IRA Disclosures separately contained a provision titled "Cash Balances" through which Plaintiffs authorized the sweep of their IRA funds, and like the RSDA, included a "reasonable rate of interest" reference.  (IRA Disclosures § 3.3.)  Similar to the RSDA, the reasonableness reference was tied to the IRC exemption language discussed above and made no reference to any of the products now identified by Plaintiffs as a basis for determining or assessing reasonableness.  (*Id.* (Plaintiffs "authorize[] the deposit or investment of cash balances . . . [in] deposit accounts with Morgan Stanley Bank, N.A., and or any other banking affiliate of [MSSB] that bear a reasonable rate of interest.").)

### C.     Plaintiffs' Allegations

On February 1, 2024, Plaintiffs filed this putative class action on behalf of persons or entities who maintained retirement accounts with E*TRADE or E*TRADE from Morgan Stanley since February 1, 2018.  (Compl. ¶¶ 124–25.)  Despite agreeing to the interest rate provisions contained in the RSDA, Updated RSDA, SDA Agreement, BDP Disclosure, and IRA Disclosures (collectively, the "Agreements"), Plaintiffs assert that E*TRADE and MSSB violated the Agreements because institutions that offer other financial products with different features (e.g., high-yield savings accounts and government money market funds) allegedly offered higher rates, rendering Defendants' rates "unreasonable."  (*Id.* ¶¶ 1, 9.)

### ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Pleading a plausible claim requires "more than an unadorned, the-defendant-unlawfully-harmed-

me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("After *Twombly*, it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts suggestive of the proscribed conduct.").  A breach of contract claim may be dismissed on the basis of unambiguous language in the agreements integral to or incorporated into the complaint. *See Redmond v. Ace Am. Ins. Co.*, 614 F. App'x 77, 79 (3d Cir. 2015) (applying New York law and dismissing breach of contract claim based on a contract's unambiguous language); *Click Corp. of Am. v. Redco Foods, Inc.*, 424 F. Supp. 2d 753, 759–60 (D.N.J. 2006) (same).[7]

Plaintiffs fail to state a claim for breach of contract for three reasons:  *First*, Plaintiffs' theory of breach hinges on a flawed interpretation of the Agreements that cannot be squared with their plain language.  *Second*, Plaintiffs fail to allege adequately that Defendants provided unreasonable rates under the Agreements' terms.  *Third*, even if Plaintiffs could plead a breach, Plaintiffs cannot allege a compensable injury.  For each and all of these independent reasons, the contract claim fails as a matter of law.  *See Lukacs v. Purvi Padia Design LLC*, 2022 WL 2116868, at *2 (D.N.J. June 13, 2022) (to state a claim for breach of contract under New York law, a plaintiff must allege: "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages").

---

[7] New York law applies to the breach of contract claim under the choice-of-law provisions in the Agreements.  (*See* IRA Disclosures § 11.1; SDA Agreement at 1; Compl. ¶ 16.)  *Fin Assocs., LP v. Hudson Specialty Ins. Co.*, 2016 WL 4414782, at *3 (D.N.J. Aug. 18, 2016) ("New Jersey courts generally enforce the choice-of-law . . . clause[] set forth in the applicable contract."), *aff'd*, 741 F. App'x 85 (3d Cir. 2018); *see also Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183–84 (3d Cir. 2017) ("New Jersey choice-of-law rules provide that ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice.").  However, to the extent Plaintiffs claim that Defendants breached the SDA Agreement, that claim is governed by the statute of limitations of the state in which each Plaintiff resides.  (SDA Agreement § 12.)

I.      **Plaintiffs' Breach Theory Is Contradicted by the Agreements' Plain Language.**

Plaintiffs' theory of breach—that the rates they received in the Sweep Programs were unreasonable because they were lower than the rates provided on other financial products—is fundamentally at odds with the Agreements' express terms governing interest rates, which disclosed that exact possibility.  The Agreements contained discrete sections describing the parameters of the interest Plaintiffs could reasonably expect and where they could find those rates in real-time on E*TRADE's website.  (RSDA § 8; SDA Agreement § 7.A.)  The Agreements plainly explained that the interest rates were to be determined by E*TRADE or MSSB through contracts with the Program Banks and that there were no set criteria that MSSB or E*TRADE promised to consider when setting rates.

Plaintiffs do not allege a breach of any of these express contract terms:  Plaintiffs do not claim interest was withheld or that rates were undisclosed.  In other words, Plaintiffs do not identify any breach of the provisions that actually set out Defendants' requirements for the provision of interest.  This fundamental flaw in the Complaint requires its dismissal.  *See Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 468 (S.D.N.Y. 2016) (dismissing breach of contract claim for "fail[ure] to plead the essential terms of the alleged agreement between the parties and which provisions, if any, were breached").

Nor can Plaintiffs identify any term in the Agreements supporting a reasonable expectation that the provision of "reasonable interest" entitled them to interest rates similar to the products they now cite.  Plaintiffs agreed multiple times to conspicuous language stating that the rates Plaintiffs would receive could be *lower than* those offered by alternative financial products, including other depository banks and the different types of products they now seek to rely on to establish as the standard of reasonableness.  (*See* RSDA § 8 (interest "may be higher or lower than the rates available to depositors making non-RSDA Program deposits with Program Banks

12

directly, through other types of accounts at [E*TRADE], with other depository institutions in comparable accounts, with money market mutual funds, or with alternative short-term investment options"); BDP Disclosure at 7 (rates "may be higher or lower than the interest available on other deposit accounts offered by a [Program] Bank or on deposit accounts offered by other depository institutions").)

To the extent that Plaintiffs sought higher rates of return out of their "free cash," they contractually accepted responsibility for comparing the Sweep Programs' rates to alternatives. (RSDA § 8 ("I understand that I should compare the terms, rates of return, required minimum amounts, charges, and other features of the RSDA Program with other accounts and investment alternatives."); BDP Disclosure at 7 (stating customers "should compare the terms, interest rates, required minimum amounts and other features of the Deposit Accounts with other deposit accounts and alternative investments.").) By the Agreements' clear terms—and Plaintiffs' unambiguous acknowledgement of them—these alternative products cannot now serve as the basis for Plaintiffs' breach of contract claim. *See DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605, at *37 (S.D.N.Y. July 27, 2009) (dismissing contract claim because "Plaintiffs have not identified any agreement that could support a reasonable expectation that Defendants were obligated to maximize Plaintiffs' earnings on uninvested funds in their brokerage accounts").

Plaintiffs now argue that IRC disclosures in the Agreements (the "Disclosure Provisions") effectively supersede these designated "Interest" sections. (Compl. ¶¶ 33, 40.)[8] Ignoring

---

[8] The two Disclosure Provisions on which Plaintiffs rely are (i) RSDA § 17 (authorizing "such RSDA Program deposits" and agreeing that Plaintiffs "understand that each Program Bank will pay a reasonable rate of interest, as contemplated by ERISA Section 408(b)(4) and the regulations under Code Section 4975(d)(4)") and (ii) IRA Disclosures § 3.3 (authorizing "the deposit or investment of cash balances in the Account in . . . deposit accounts with Morgan Stanley Bank, N.A. and/or any other banking affiliate of the Custodian that bear a reasonable rate of interest").

entirely the unambiguous "Interest" provisions in which they acknowledged that their rates could be lower than alternatives and accepted the responsibility to make that comparison themselves, Plaintiffs claim that an entirely separate section of the Agreements in which they authorized the use of affiliated bank accounts created a contractual entitlement to rates paid by other institutions or in other products. Plaintiffs' interpretation of the Disclosure Provisions as requiring Defendants to provide higher rates is unreasonable for several reasons.

*First*, by their plain terms, the Disclosure Provisions make no reference to the rates provided by other investment products (as Plaintiffs now suggest), nor do they purport to displace the specific agreements between the parties in the Interest section that details what interest rates Plaintiffs could *and could not* expect. The Disclosure Provisions simply mirror language in a regulatory requirement that facilitates a tax exemption for these tax-advantaged accounts. (*See supra* at 7.) The Disclosure Provisions do not supersede the Agreements' specific terms that the rates provided by the Program Banks may be lower than other products, and cannot be read to entitle Plaintiffs to reject retroactively the contractual parameters of the rates to which they agreed.

Under well-settled contract principles, contracts must be read as a whole so that no provisions are rendered meaningless. *Bat Blue Corp. v. Situs Holdings, LLC*, 2016 WL 3030814, at *3 (D.N.J. May 26, 2016) ("[A] contract should be construed so as to give effect to all its terms and not to render any of those terms meaningless."). The current interpretation proffered by Plaintiffs seeks to render the entire Interest section of the Agreements meaningless. Plaintiffs cannot circumvent the Agreements' specific and clear contractual disclosures regarding interest by relying on a general statement in a separate section of the agreement. *Wade Park Land*

*Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 393 (S.D.N.Y. 2022) (Under New York contract law, "[w]here there is tension between provisions, the more specific governs over the general.").

In *DeBlasio v. Merrill Lynch & Co.* the court rejected similar breach of contract arguments that were contradicted by the unambiguous terms of contracts governing a sweep program. 2009 WL 2242605. There, the plaintiffs claimed that brokerage firms breached agreements governing cash swept from customers' brokerage accounts because the firms generated additional profits when they modified their sweep programs to sweep cash to standard deposit accounts instead of money market mutual funds. *Id.* at *1–2. The relevant agreements disclosed that customers should "compare the terms, interest rates . . . and other features of the [sweep program] with other accounts and alternative investments," and that the firms were under no "obligation to ensure [investment clients] receive any particular rate of interest or to advise [clients] to invest . . . cash or bank deposit balances in higher yielding cash alternatives." *Id.* at *17–18.

In dismissing the plaintiffs' breach of contract claim, the *DeBlasio* court emphasized that the plaintiffs had failed to "point to any provision of an agreement that could plausibly give rise to an expectation on their part that Defendants were somehow subject to a limitation on the amount of profits that they were allowed to make in connection with the Cash Sweep Programs." *Id.* at *37. The court further held that the plaintiffs did not identify "any agreement that could support a reasonable expectation that Defendants were obligated to maximize Plaintiffs' earnings on uninvested funds in their brokerage accounts." *Id.* (emphasis removed). Plaintiffs' claim should be dismissed for the exact same reasons.[9]

---

[9] More generally, courts routinely hold that customers are bound by clear language contained in banking agreements. *See Hassler v. Sovereign Bank*, 374 F. App'x 341, 344 (3d Cir. 2010) (affirming dismissal of class action claim under the New Jersey Consumer Fraud Act where

*Second*, insofar as Plaintiffs are attempting to claim that Defendants failed to comply with IRC § 4975(d)(4)  (*see* Compl. ¶¶ 44–55), that argument fails because Plaintiffs are not suing to recover for alleged tax exemption issues, the entire purpose of the sections Plaintiffs rely on for their claims.  The Disclosure Provisions invoked by Plaintiffs relate solely to the establishment and maintenance of tax-exempt status on the transfers to and from Plaintiffs' affiliated sweep accounts.  Had E*TRADE or Morgan Stanley failed to provide a reasonable rate, it might have rendered these transfers taxable—but it would not have entitled Plaintiffs to a higher rate of interest.  Tellingly, Plaintiffs have not alleged any adverse tax consequences, and they do not allege that their accounts have not been tax-qualified throughout the relevant period.[10]  Accordingly, there is no basis for any legal claims related to any purported violations of the Agreements' Disclosure Provisions.

## II.   The Complaint Fails to Plead That the Sweep Programs' Rates Were Unreasonable.

Plaintiffs also do not allege adequate facts to show that the Sweep Programs' rates were "unreasonable" under the Agreements because (i) under Plaintiffs' own standard of reasonableness, Defendants' rates were reasonable, (ii) Plaintiffs use improper comparators, and (iii) Plaintiffs' data comparing Defendants' rates to other sweep rates do not reflect that Defendants' rates were unreasonable.

---

bank's account agreement "explicitly provided for the reordering of charges of which [plaintiff] complain[ed]" in agreement's disclosure provisions); *HV Assoc., LLC v. PNC Bank, N.A.*, 2019 WL 13410676, at *10 (D.N.J. May 20, 2019) (dismissing breach-of-contract claim where bank disclosed customer transaction information because "[n]othing in the contractual provisions limit[s] who [the bank] may share information with" (cleaned up)).

[10] Any such argument would be independently precluded by the SDA Agreement, which states that "[MSSB] shall not be liable to [Plaintiffs] as a result of any action or inaction taken by Morgan Stanley to comply with Applicable Law" and that "the terms of this Self-Directed Account Agreement do not create a private right of action."  (SDA Agreement § 3.C.)

A.     **Defendants' Rates Meet Plaintiffs' Definition of Reasonableness.**

Plaintiffs claim that while the Agreements do not define "reasonable," a reasonable rate of interest is "the rate that would result in a competitive market under fair market valuation conditions, i.e., a rate parties would agree to in an arm's length transaction where neither party was able to exert market power over the other." (Compl. ¶ 68.) Plaintiffs inappropriately suggest there was not an arm's length transaction here because Defendants were affiliated with the banks that provided the Sweeps Programs. (*Id.* ¶¶ 83–88.) But if Plaintiffs' test is applied correctly, the Sweep Programs' rates pass it with flying colors: Plaintiffs, together with thousands of other customers, made the arm's length decision to maintain accounts with Defendants and to participate in the Sweep Programs in lieu of pursuing other options. As the Complaint itself demonstrates, customers affirmatively chose to maintain their IRAs with Defendants and to participate in the Sweep Programs, and those arm's length market transactions together establish that Defendants' offering was reasonable.

The Complaint itself underscores that the market for brokerage services, including IRA accounts, is a competitive one, with investors having a choice among many brokers. (*Id.* ¶¶ 93, 99–101.) If an investor was not satisfied with the Sweep Programs, he or she could establish his or her IRA with a different broker.[11] If, having elected to invest through E*TRADE and participate in the Sweep Programs, an investor ceased to be satisfied with the offered rates, he or she could withdraw from the Sweep Programs or E*TRADE altogether. (*See* RSDA § 11 ("I understand that, at any time, I may withdraw my consent to participate in the RSDA Program."); SDA Agreement § 19 (stating customers could "at any time close [their] Self-Directed

---

[11] Customers could also freely elect to opt out of participating in the Sweep Programs. (RSDA § 11; Revised RSDA § 11; BDP Disclosure at 12.)

Account(s) by giving Morgan Stanley notice").)  And at all times, a customer could choose to *invest* the uninvested cash.

In deciding whether to invest with E*TRADE and participate in the Sweep Programs, investors had ready access to the rates that would apply to the uninvested cash in their accounts—not only through their account statements but on a real-time, 24-hours-a-day, 7-days-a-week basis through Defendants' call center and dedicated website.  (RSDA § 8; SDA Agreement § 7.A; BDP Disclosure § 11.)  Plaintiffs contractually accepted responsibility for comparing those rates to other products in the market.  (RSDA § 8; BDP Disclosure at 7.)[12]  If maximizing rates was a customer's driving concern, over liquidity and safety, the customer could simply obtain higher returns by investing their cash in other products.  These rates *were* the result of arm's length transactions in a competitive market where Defendants had no "market power" to require IRA investors to accept the disclosed rates or maintain uninvested cash in their accounts.

Courts have recognized that the selection of a product by customers who can vote with their feet establishes the reasonableness of the product's financial terms as a matter of law.  For example, the court in *Dupree v. Prudential Insurance Co. of America* held that an insurer's investment of its employee retirement plan's assets in the insurer's own pooled accounts qualified for an exemption under ERISA § 408(b)(8)—which requires that the compensation

---

[12] Customers could compare other firms' rates to Defendants' rates by accessing publicly available rates published on other firms' websites.  *See, e.g.*, https://digital.fidelity.com/prgw/digital/fdic-interest-rate/fcma (providing Fidelity's sweep rates). Because Plaintiffs quote from and cite Fidelity's website in the Complaint (*see* Compl. ¶ 92 n.24), they explicitly rely upon Fidelity's website and it is incorporated by reference and can be considered.  *See N.J. Second Amend. Soc'y v. N.J. Press Ass'n.*, 2021 WL 4822050, at *5 (D.N.J. Oct. 15, 2021) (finding good cause to incorporate by reference and consider defendant's website in ruling on a motion to dismiss where the complaint "quote[d] directly from [the] website").

paid through such accounts be "reasonable."  2007 WL 2263892, at *41 (S.D. Fla. Aug. 7,

2007); 29 U.S.C. § 1108(b)(8).  The court found that other investors' willingness to invest in the

same pooled accounts at the same rates was sufficient as a matter of law to establish

reasonableness for purposes of ERISA § 408.  2007 WL 2263892, at *41.[13]

      The rationale of the *Dupree* court is consistent with the holdings of other courts that

likewise had to evaluate the reasonableness, as a matter of law, of market-tested terms.  *See, e.g.*,

*Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (noting, in dismissing claim that

defendants caused plan to invest in options with excessive fees, that, "[i]mportantly, all of these

funds were also offered to investors in the general public, and so the expense ratios necessarily

were set against the backdrop of market competition"), *abrogated on other grounds by Hughes v.*

*Nw. Univ.*, 63 F.4th 615 (7th Cir. 2023); *see also In re Honda Am. Mfg., Inc. Erisa Fees Litig.*,

661 F. Supp. 2d 861, 867 (S.D. Ohio 2009) (same); Best Interest Contract Exemption, 81 Fed.

Reg. 21002, 21031 (Apr. 8, 2016) (to be codified at 29 C.F.R. pt. 2550) (explaining that an

ERISA exemption is available when "the Best Interest standard is satisfied and the compensation

is reasonable" and "[u]ltimately, the 'reasonable compensation' standard is a market based

standard").[14]

---

[13] *See also Horn v. McQueen*, 353 F. Supp. 2d 785, 807 (W.D. Ky. 2004) (explaining that
regulations proposed by the Secretary of Labor concerning the term "fair market value," which
is used in 29 U.S.C. § 1002(18)(B)'s definition of "adequate consideration" for purposes of
ERISA's prohibited transactions exemption scheme, defines "'fair market value' . . . as the price
at which an asset would change hands between a willing buyer and a willing seller when the
former is not under any compulsion to buy and the latter is not under any compulsion to sell, and
both parties are able, as well as willing, to trade and are well-informed about the asset and the
market for that asset").

[14] Defendants' rates likewise meet Plaintiffs' alternative definition of reasonableness taken from
Department of Labor ("DOL") guidance.  Plaintiffs claim that an individual exemption under
§ 408(b)(4) from a "prohibited transaction" issued by the DOL to Deutsche Bank AG in 2003
supports that a definition of reasonableness "took into account a broad range" of products.
(Compl. ¶¶ 72–74 (citing Prohibited Transaction Exemption 2003-11, 68 Fed. Reg. 34646, 34648

By Plaintiffs' own telling, thousands of IRA investors in a competitive market chose to take advantage of *Defendants'* brokerage and sweep services, instead of maintaining their accounts elsewhere or placing their cash elsewhere.  According to Plaintiffs' own market test, then, the rates enjoyed by participants in the Sweep Programs were reasonable as a matter of law, both for purposes of their Agreements and for purposes of the prohibited transaction exemption that facilitates their tax-qualified accounts.  *See Leber v. Citigroup, Inc.* 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010). (recognizing market-tested terms in context of affiliated mutual fund investments).

**B.     Plaintiffs' Comparison to Rates Provided by Distinct Products and Financial Institutions Is Inappropriate.**

Plaintiffs' claim independently fails because the Complaint offers no allegations that overcome the conclusion that the Sweep Programs' market-tested rates are reasonable.  The Complaint attempts to make that showing by comparing Defendants' rates to three categories of rates which Plaintiffs claim demonstrate unreasonableness:  (i) rates paid on money market funds; (ii) sweep rates provided by other brokerage firms, such as Fidelity Investments and RW Baird; and (iii) the rate paid on Morgan Stanley's Premium Savings Account.  (Compl. ¶¶ 83–123.)  But each of those comparators is inapt for a number of reasons.

As an initial matter, to the extent that a comparison to other offerings is appropriate at all, the comparison must be to products with materially similar features, including risk, access to the cash, and fees or other conditions of participation.  Plaintiffs make no such comparison, and

---

(June 10, 2003).)  Defendants do not concede that this guidance provides a relevant standard for measuring whether Defendants complied with their contractual obligations concerning the provision of interest.  But even assuming Plaintiffs are correct for the purposes of this motion, Plaintiffs conveniently omit that this exemption further clarified that "[t]he requirement that an interest rate be 'reasonable' does not preclude the payment of *no interest*" under certain circumstances.  68 Fed. Reg. at 34648.

instead identify as their purported barometer of reasonableness a hodge-podge of investment products, all of which allegedly paid a higher rate of interest than the Sweep Programs' rates for some period of time.

Plaintiffs' "round peg, square hole" approach is not new and has been rejected as a matter of law.  In *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, the court repeatedly rejected arguments that rates provided by money market mutual funds and other investment vehicles Plaintiffs cite could serve as a basis for assessing the reasonableness of the rates offered by a sweep program.  2023 WL 4239073 (S.D.N.Y. June 28, 2023).  The *Valelly* court explained that a  plaintiff "cannot use the interest rate paid on one type of investment vehicle to prove that the interest rate paid on a different type of investment vehicle is not reasonable." *Id.* at *4.[15]  Here, *all* of Plaintiffs' comparators are distinct from Defendants' bank sweep vehicle, and thus none of Plaintiffs' comparisons supports the conclusion that the rates Plaintiffs actually enjoyed were unreasonable.

***Money Market Funds.***  Plaintiffs cannot allege that money market funds are an appropriate comparator because they are fundamentally different from the deposit accounts offered through Defendants' Sweep Programs.  Unlike deposit accounts, which are FDIC-insured and offer immediate liquidity, money market mutual funds are *not* FDIC-insured *and* lack immediate access to funds.  Further, the cash in deposit accounts is typically used by banks to make loans, whereas (as Plaintiffs acknowledge (Compl. ¶ 105)) at least 99.5% of the cash in a

---

[15] Although the plaintiff in *Valelly* was granted leave to file an amended pleading which Merrill Lynch did not move to dismiss, the contract claim that proceeded is extremely narrow.  *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2021 WL 240737, at *2 (S.D.N.Y. Jan. 25, 2021).  In particular, the *Valelly* court has continued to underscore that the "mere fact that [Merrill Lynch's] rate was below the average rate does not provide that the rate was not 'reasonable,'" and has rejected plaintiffs' attempts to compare Merrill Lynch's rates to different products.  *Id.* at *2, n.1; *see also Valelly*, 2023 WL 4239073, at *4.

government money market fund must be invested in short-term government securities. *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2023 WL 2918982, at *8 (S.D.N.Y. Apr. 12, 2023) (observing the different nature of the products and noting that banks use customer cash, such as that in money market deposit accounts "subject to [their] capital requirements, to make loans" whereas most funds in a government money market fund "must be invested in government securities or repurchase agreements," which impacts the interest rate paid).

The plaintiff in *Valelly*, who is represented by the same counsel as Plaintiffs here, similarly argued that money market mutual funds represented an appropriate comparator for assessing the reasonableness of sweep rates. *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 644–45 (S.D.N.Y. 2020). In rejecting this argument, the *Valelly* court emphasized that there is no basis for comparing money market funds to sweep deposit accounts because they are two fundamentally different products. *Id.* In doing so, the court noted that the availability of FDIC insurance for money market deposit accounts is a crucial distinction between the two different vehicles.[16] 2023 WL 4239073, at *4–5. There is no basis, legal or

---

[16] Plaintiffs' own sources for their allegations emphasize this key difference between money market mutual funds and money market deposit accounts, and that disclosures of such differences are required. (Compl. ¶¶ 118, 122 n.40 (citing NYSE Information Memorandum 05-11 (2005), *available at* https://www.nyse.com/publicdocs/nyse/markets/nyse/rule-interpretations/2005/05-11.pdf ("Member organizations comparing the risk of loss in an FDIC insured account to the risk of loss of an investment in a money market mutual fund for which SIPC protection is or is not available should be certain that their descriptions are accurate and not misleading.")).); *see also* David Armstrong, *Fidelity Highlights Benefits of Default Cash Options for Retail Accounts*, Wealth Management (Aug. 7, 2019), https://www.wealthmanagement.com/investment/fidelity-highlights-benefits-default-cash-options-retail-accounts (last visited Mar. 9, 2024) ("To be sure, money market funds don't have the same protections that bank sweep [deposit] accounts do. They aren't insured by the Federal Deposit Insurance Corporation, and returns are not guaranteed."); Daren Fonda, *Fidelity Is Giving Customers Higher Rates on Cash. Here's Why.*, Barron's (Aug. 9, 2019); https://www.barrons.com/articles/fidelity-sweep-accounts-cash-rates-federal-reserve-schwab-merrill-lynch-vanguard-etrade-51565291732 (last visited Mar. 9, 2024).)

otherwise, to consider money market mutual funds as a benchmark for determining the reasonableness of interest rate payments for a bank sweep deposit account.

**Morgan Stanley's Premium Savings Account**.  Plaintiffs' comparison to the rates paid on Morgan Stanley's Premium Savings Account is similarly improper because Plaintiffs fail to allege that this investment option has *any* of the characteristics typical of sweep accounts—such as unrestricted liquidity—to substantiate that the factors determining rates of interest would be alike.  (Compl. ¶¶ 102–06.)  On the contrary, a savings account typically has features like withdrawal limits that promote the deposits' stability, which in turn helps support higher interest payments at the expense of the client's liquidity needs.

**Other Sweep Programs.**  Plaintiffs do not adequately allege that the other sweep programs they cite as comparators have materially similar features to the Sweep Programs such that they would be apt comparators for the purpose of assessing reasonableness.  (Compl. ¶¶ 83–106.)  There are no alleged facts, for example, regarding:  (i) whether the cited comparators have the same degree of access to funds as the Sweep Programs; (ii) whether and to what extent FDIC insurance was provided; and (iii) the presence or absence of fees and other conditions relating to the accounts.  Plaintiffs make no effort to address any crucial differences among the programs and how those features would reasonably affect interest rates.

The failure to plead material similarities between the proposed comparators and the Sweep Programs is fatal to Plaintiffs' claim because other products can include costs, risks, limits on liquidity or accessibility to swept cash, and other differences that render them inapt comparators to the Sweep Programs.  *See, e.g.*, *Davis v. Washington Univ. St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020) ("Comparing apples and oranges is not a way to show that one is worse than the other"); *Dupree v. Prudential Ins. Co. of Am.*, 2007 WL 2263892, at *12, *37 (S.D. Fla.

Aug. 7, 2007) (in the ERISA context, finding plan fiduciaries "diligently carried out their responsibilities to monitor and review plan . . . performance" where they "compared Plan investments to performance records of other investments following the same investment style"); *cf. Tibble v. Edison Int'l*, 729 F.3d 1110, 1113 (9th Cir. 2013) (rejecting effort to compare mutual fund expenses to costs of institutional investments as "apples-to-oranges" comparison in light of material distinctions in investment features), *vacated on other grounds*, 135 S. Ct. 1823 (2015).

Indeed, Plaintiffs' own allegations demonstrate the fundamentally different nature of the sweep programs they offer as comparators. For example, the Complaint cites sweep programs offered by Fidelity and Vanguard—investment vehicles that the Plaintiffs acknowledge swept cash to money market mutual funds during part of the class period. (Compl. ¶¶ 112, 122.) As the *Valelly* court recognized, money market mutual funds do not provide FDIC insurance and have distinct liquidity features that render them an inappropriate comparator. *See* 2023 WL 4239073, at *4–5; 2023 WL 2918982, at *8 n.22. The Fidelity press release that Plaintiffs tout (Compl. ¶ 92 n.24) itself acknowledges that an "[i]mportant difference" between a money market fund and the bank sweep programs offered by Defendants and others is that "bank sweep products"—but not the Fidelity alternative—"have FDIC protection, which guarantees principal and interest[.]" Press Release, Fidelity Investments, Fidelity Investments Takes Another Strong Step to Provide Investors Unparalleled Value (Aug. 7, 2019), https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/press-release/fidelity-breaks-status-quo-080719.pdf.

Moreover, the Fidelity press release expressly acknowledges that the rate offered (1.91%) was "*contrary to typical industry practices*," citing Schwab's rate at 0.18% and TD Ameritrade's rate of 0.04%. *Id.* Thus, according to Fidelity itself, its rate was an outlier and not consistent

24

with industry standards.  Courts have repeatedly declined to find unreasonable rates based on a comparison to outliers.  *See, e.g.*, *Divane v. Nw. Univ.*, 953 F.3d 980, 989 (7th Cir. 2020) ("That plaintiffs prefer low-cost index funds . . . does not make [an active fund's] inclusion in the plans a fiduciary breach."); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) ("[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."), *abrogated on other grounds by Hughes v. Nw. Univ.*, 63 F.4th 615 (7th Cir. 2023); *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 345–46 (2d Cir. 2006) ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion.").

Even assuming that Plaintiffs are correct that a comparison to other, dissimilar sweep programs is relevant to their Agreements with Defendants, Plaintiffs' comparisons improperly rely on incomplete data that do not support the inference that the Sweep Programs' rates were unreasonable.  Plaintiffs broadly assert that "even when measured against other brokerages, E*TRADE consistently found itself at the bottom when compared to its peers" (Compl. ¶ 97), but provide only abbreviated glimpses into the rates in place over the relevant period, with purported examples from "2018 and into 2019" (without further specificity), as of March 29, 2019, and from July 29, 2022, through January 30, 2024.  (*Id.* ¶¶ 11, 12, 60.)  This makes it impossible to compare Defendants' sweep rates to any of the purported comparators' rates during the periods Plaintiffs have omitted from their allegations, including a period of more than three years from April 2019 through July 2022.

Plaintiffs' allegations of competitors' sweep rates also do not track the same time periods for which Plaintiffs provide Defendants' alleged sweep rates, making it difficult to assess if, when, and how they diverged.  For example, although Plaintiffs allege Fidelity's "FDIC-insured

sweep rate and R.W. Baird's sweep rates have been at all times since March 2022 substantially higher than the rates paid by E*TRADE and E*TRADE by Morgan Stanley," Plaintiffs offer no concrete allegations or data regarding either institution's sweep rates prior to this timeframe, which encompasses most of the class period.  (*Id.* ¶ 101.)  Instead, Plaintiffs' only specific allegations regarding Fidelity's data—that at the end of 2022, "Fidelity paid 2.21% interest on cash balances regardless of tier" (*id.* ¶ 90), beginning in August 2023, Fidelity "paid as much as 2.72% APY on swept cash regardless of AUM" (*id.* ¶ 13), and "as of January 12, 2024, Fidelity paid 2.69% interest on cash balances regardless of tier" (*id.* ¶ 91)—are limited to December 2022 through January 2024 and do not clarify whether Fidelity provided this rate for its money market mutual fund sweep rate (Fidelity's default option) or for its FDIC-insured sweep vehicle. Plaintiffs' specific allegations as to R.W. Baird's sweep rates are similarly limited to December 2022, September 8, 2023, and January 12, 2024.  (*Id.* ¶¶ 13, 90, 91.)  Likewise, Plaintiffs only allege Robinhood's sweep rates as of August 11, 2022 and July 27, 2023, but not prior or subsequent to these dates.  (*Id.* ¶ 100.)  And as to Interactive Brokers, WeBull and Vanguard, the proffered data for their sweep interest rates lack dates altogether—making it impossible to compare their rates to those of E*TRADE.  (*Id.*)

It is insufficient as a matter of law to allege that a rate is unreasonable based even on a comparison to *prevailing* market rates, much less incomplete, cherrypicked ones.  Courts have held that "a reasonable rate may be different from the prevailing or market rate" and that evidence of prevailing or market rates alone are "insufficient" to show non-compliance with a reasonable rate requirement.  *Brock v. Walton*, 794 F.2d 586, 588 (11th Cir. 1986); *see also In re Simpson*, 61 B.R. 580, 582 (Bankr. W.D.N.Y. 1986) (finding interest rates "at the low end of the spectrum . . . cannot be deemed to be unreasonable").  Even if these alleged comparators' data

represented an appropriate benchmark (they do not), Plaintiffs' piecemeal "analysis" does not support the inference that the Sweep Programs' rates were unreasonable.

\* \* \*

In sum, Plaintiffs' proposed comparators were either explicitly rejected in *Valelly* or fail under the reasoning of *Valelly* and other courts.  The *Valelly* court has repeatedly reiterated that dissimilar financial products are improper benchmarks because the factors that determine the interest rates paid on one product are different from factors determining interest rates on different products, and it "is not surprising then, that at the end of the day, the resulting interest rates paid diverge."  2023 WL 2918982, at \*8; *see also Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2021 WL 240737, at \*2 (S.D.N.Y. Jan. 25, 2021) (emphasizing that, as the court "held in its prior opinion, comparisons to interest rates paid on [distinct] investment products. . . are *irrelevant* to whether the rate paid on [p]laintiff's money market deposit account was reasonable").  Plaintiffs simply ignore these holdings and the economic reality that different financial products, and different sweep programs, entail different tradeoffs and risk profiles, all of which affect the rate of interest that a firm is willing to provide, and what a customer is willing to accept.

## III.   Plaintiffs Do Not Plead That They Were Injured by E*TRADE's and MSSB's Alleged Breaches.

Plaintiffs also cannot plead a fundamental element of a breach of contract claim:  that they were injured by the alleged breach.  *See Parker Waichman LLP v. Squier, Knapp & Dunn Commc'ns, Inc.*, 28 N.Y.S.3d 603, 603 (N.Y. App. Div. 2016) (affirming lower court's dismissal of plaintiff's breach of contract claim where complaint failed to allege how purported breach caused any harm to plaintiff); *see also AmBase Corp. v. 111 W. 57th Sponsor LLC*, 148 N.Y.S.3d 61, 62–63 (N.Y. App. Div. 2021) (affirming dismissal of breach of contract claim because

complaint "does not allege any resulting damages, and therefore fails to state a cause of action for breach of contract").

"Because a plaintiff may recover only for damages that are directly and proximately caused by a defendant's breach of contract, causation is an element—and a crucial one—of the plaintiff's prima facie case." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 526 (2d Cir. 2004). The interest rates that Plaintiffs actually received through the Sweep Programs were the result of their own investment decisions, not any breach by Defendants. Under the Agreements, Plaintiffs could allocate their cash to other investments; Plaintiffs could opt out of the Programs; and they could always move the uninvested cash to other tax-qualified accounts. Plaintiffs agreed to "assume full responsibility for each and every transaction," "investment strateg[y]," and "decision," concerning their IRAs, and agreed that "Morgan Stanley has no liability whatsoever for the results of [Plaintiffs'] investments strategies, transactions, and decisions." (SDA Agreement § 1.A.) In light of these agreements, Plaintiffs cannot support their conclusory claim that they "have been and continue to be injured." (Compl. ¶ 132.) *Gawrych v. Astoria Fed. Savings & Loan*, 48 N.Y.S.3d 450, 454 (N.Y. App. Div. 2017) (holding trial court should have dismissed breach of contract claim "since the complaint only contains conclusory allegations of damages resulting from the alleged breaches").

This is particularly so since there are no allegations suggesting that Plaintiffs "were in any way precluded from" using their uninvested cash balances "to purchase mutual funds, stocks, or other investments that would be riskier but potentially more profitable." *Welch v. TD Ameritrade Holding Corp.*, 2009 WL 2356131, at *9 (S.D.N.Y. July 27, 2009). Indeed, the Complaint gives this away, alleging that Mr. Burmin "found it necessary to modify his approach

to investing dividends received" and "has been compelled to promptly reinvest the funds." (Compl. ¶¶ 66, 132.)

This is not evidence of *damages*—this is precisely what an investor should do with uninvested cash when he or she wants the opportunity to generate investment returns.  Plaintiffs could (and did) pursue actual investments using their cash, and the Sweep Programs gave them the ability to access funds without delay, exactly as designed.  *Welch*, 2009 WL 2356131, at *7 ("[O]ne of the most obvious options available to [sweep customers] [is] investing or withdrawing their *uninvested* free credit balances."); *DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605, at *31 (S.D.N.Y. July 27, 2009) ("By definition, free credit balances existed in Plaintiffs' brokerage accounts because Plaintiffs chose not to invest these funds and instead left them idle in their accounts.").  In the end, Plaintiffs are seeking rates that would provide a windfall, not the benefit of what they bargained for under the Agreements.

## CONCLUSION

For these reasons, the Court should grant Defendants' motion to dismiss the Complaint with prejudice.

Dated:  April 15, 2024

Kevin H. Marino
John D. Tortorella
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, NJ 07928
Phone:  973-824-9300
Facsimile:  973-824-8425
kmarino@khmarino.com
jtortorella@khmarino.com

Pamela A. Miller (admitted *pro hac vice*)
Lauren M. Wagner (admitted *pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square

New York, NY 10036
Phone:  212-326-2000
Facsimile:  212-326-2061
pmiller@omm.com
lwagner@omm.com

Meaghan VerGow (admitted *pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Phone:  202-383-5300
Facsimile:  202-383-5414
mvergow@omm.com

*Attorneys for Defendants*